

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE KNIT WITH, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KNITTING FEVER, INC., | : | |
| DESIGNER YARNS, LTD., | : | |
| FILATURA PETTINATA V.V.G. DI | : | |
| STEFANO VACCARI & C., SION | : | NO. 08-4221 |
| ELALOUF, DIANE ELALOUF, JEFFREY J. | : | |
| DENECKE, JR., JAY OPPERMAN, and | : | |
| DEBBIE BLISS, | : | |
| | : | |
| Defendants. | : | |

FILED
DEC 18 2008
MICHAEL E. KUNZ, Clerk
    Dep. Clerk

MEMORANDUM

BUCKWALTER S. J.                                                          December 18, 2008

Currently pending before the Court is the Motion of Defendants Knitting Fever, Inc., Sion Elalouf, Diane Elalouf, Jeffrey J. Denecke, and Jay Opperman (collectively "Moving Defendants") to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Motion is granted in part and denied in part.

I.  **FACTS AND PROCEDURAL HISTORY**

According to the facts set forth in the Complaint,[1] Plaintiff, The Knit With ("The Knit"), is a small, family owned and operated business, established in 1971, that engages in retail sales to consumers of specialty yarns and accessories, from its location at 8226 Germantown Avenue, Philadelphia, Pennsylvania. (Compl. ¶ 3.) Defendant Knitting Fever, Inc. ("KFI") is a

---

1. The factual summary is crafted entirely from the Complaint and accepts the allegations of that Complaint as true.

New York corporation, existing since 1980, run by Sion Elalouf as the chief executive officer and either the sole or dominant shareholder. (Id. ¶ 4.)

### A. History of Plaintiff's Relationship with Defendant KFI

Since the mid-1980's and through late 2005, Plaintiff maintained a commercial relationship with Defendant KFI. (Compl. ¶ 26.) Plaintiff sourced from KFI a number of hand knitting products, including yarns purportedly spun with a cashmere content and marketed by KFI under a variety of brand names, including "Debbie Bliss" and KFI's own house brand name. (Id.) In the mid-1990's, Defendant Jay Opperman joined KFI as a sales representative. (Id. ¶ 17.) Via his relationship with Plaintiff, the percentage of The Knit's inventory represented by KFI-sourced products steadily increased, such that, for several years up to 2002, KFI was Plaintiff's leading vendor. (Id.) KFI negotiated payment of invoices for a variety of entities, including Knitting Fever, Inc., KFI, Inc., KFI, Inc. d/b/a Euro Yarns, and Euro Yarns d/b/a Elizabeth Austen. (Id.)

In the summer of 2002, Plaintiff voiced dissatisfaction with several allegedly commercially unreasonable KFI trade practices, including: incomplete shipments, extensive backorders, shipments arriving long after requested and expected delivery dates, orders being fulfilled through multiple small shipments, and trade rumors that KFI would supply a mass-market retailer the same branded products which had been distributed only to speciality retailers such as Plaintiff. (Id. ¶ 18.) Mr. Opperman acknowledged the complaints, identified KFI's Roosevelt, NY warehouse as the cause of most of the complaints, and represented that the sales of specialty goods to mass market retailers was merely an experimental venture. (Id. ¶ 19.)

Plaintiff renewed these objections in mid-summer 2004, and was told that these problems would be rectified when KFI moved to its new warehouse and got new computer systems. (Id. ¶ 20.)

KFI moved its operations to Amityville in early 2005, yet Plaintiff continued to voice its complaints about KFI's practices, and raised new concerns about additional practices including duplicative invoicing for single shipments, shipments arriving after seasonal changes in merchandise offerings, and shipping pre-paid orders "C.O.D." (Id. ¶¶ 21-22.) Following discussions between Plaintiff and KFI, KFI's warehouseman telephoned Plaintiff to communicate Defendant Sion Elalouf's decision to terminate KFI's commercial relationship with Plaintiff. (Id. ¶ 24.)

### B. The Specialty Yarn Trade

Beginning in the 1980's, importer-wholesalers in the U.S. hand knitting yarn trade began offering yarns branded under "designer" names. (Id. ¶ 26.) KFI participated in this trend, and created a "designer" line wholly controlled by the importer-wholesaler. (Id. ¶ 27.) This line of yarns achieved success within a few years following its introduction. (Id. ¶ 27.) In 1999, Defendant Debbie Bliss, then primarily engaged in retailing yarns in London, sought to create a line of "value" yarns branded under her own name for sale to consumers in her London retail business. (Id. ¶ 28.)

Between 1999 and June 9, 2001, Sion Elalouf puportedly entered into an agreement with Defendant Debbie Bliss, whereby Mrs. Bliss would create a fully controlled "designer" product – the "Debbie Bliss" line of yarns – that would be exclusively imported and wholesaled by KFI and Sion Elalouf. (Id. ¶ 30.) Thereafter, Mr. Elalouf and Defendant Jay Opperman formed a company to hold the brand names and distribution rights to designer yarns,

incorporated in England as Designer Yarns, Ltd. (Id. ¶ 31.) Designer Yarns entered into agreements whereby KFI would be the sole U.S. importer-wholesaler of products manufactured for Designer Yarns, and Debbie Bliss would license her name to brand yarns marketed as Debbie Bliss yarns. (Id. ¶ 31.) Although Mr. Elalouf is not listed as a shareholder, director, or participant in Designer Yards, Ltd., Plaintiff avers that he is "intimately involved with and entirely controls Designer Yarns and the merchandising of its products." (Id. ¶ 33.)

    C.    <u>The Introduction of Cashmerino Yarn</u>

Between July 5, 2000 and June 9, 2001, Mr. Elalouf discovered that there were two versions of a yarn called Cashmerino – one spun with a quantity of cashmere, the other with no cashmere at all – which were virtually indistinguishable, even to an experienced person, without an expert fiber analysis. (Id. ¶ 34.) Although KFI had many employees, only Sion and Diane Elalouf had access to documents concerning yarns imported and wholesaled by KFI. (Id. ¶ 35.)

Prior to June 9, 2001, Mr. Elalouf and Designer Yarns entered into an agreement to substitute the zero percent cashmere version of Cashmerino for the Cashmerino version spun of twelve percent cashmere. (Id. ¶ 36.) Thereafter, Alberto Oliaro, the principal officer of Defendant Filatura Pettinata V.V.G. Di Stefano Vaccari & C. ("Filatura Pettinanta"), was directed to manufacture the zero percent cashmere yarn through a spinner, but label the finished product as spun of twelve percent cashmere. (Id.) The zero-cashmere version of Cashmerino was included in the new line of Debbie Bliss yarns for marketing by Designer Yarns, and was subsequently imported to the United States for wholesale distribution by KFI under both the Debbie Bliss brand and the K.F.I. brand. (Id. ¶ 36.)

4

Prior to the formal release of the Cashmerino yarns at the June 9-11, 2001 United States trade show, Jay Opperman introduced Plaintiff to K.F.I. Cashmerinos DK, a type of yarn described as a premium hand knitting yarn spun of 55% merino wool, 33% microfiber and 12% cashmere. (Id. ¶ 37.) Upon Mr. Opperman's representations, Plaintiff purchased the Cashmerinos DK for resale and, in the course of time, added 45.5 kilos of the product to its inventory. (Id.)

The new Debbie Bliss line was debuted by KFI at the June 2001 trade show. (Id. ¶ 38.) Plaintiff committed to purchase the Debbie Bliss line, including Cashmerino Aran, for Autumn, 2001 delivery. (Id. ¶ 38.) At least twice per year, from August 2001 to Autumn 2005, KFI mailed to Plaintiff a price/product list identifying the K.F.I. and Debbie Bliss Cashermino products as spun of a fiber content consisting of 55% merino wool, 33% microfiber and 12% cashmere. (Id. ¶ 39.) In 2003, Plaintiff committed to buy a line extension of Debbie Bliss Cashmerino, called Cashmerino Baby, also purportedly spun of the same content and composition. (Id. ¶ 40.) Between August 2001 and Autumn 2005, Plaintiff purchased from KFI, for resale to hand knitting consumers, an equivalent total of 1,210 balls (approximately 60.5 kilos) of the Debbie Bliss Cashmerino yarns. (Id. ¶ 41.) In the same period, Plaintiff sourced an equivalent of 910 balls (approximately 45.5. kilos) of K.F.I. Cashmerinos DK. (Id.)

D. **The Discovery of Mislabeling in Cashmere Yarn**

By 2004, Cashermino became the best selling specialty type of yarn in the industry, to the point that KFI's supplier was unable to meet consumer demand. (Id. ¶ 43.) In an effort to satisfy this demand, a competitor sought to "knock off" the Cashmerino product and, by reverse-engineering, discovered that Cashmerino Aran was not spun with any cashmere at all.

5

(Id. ¶ 44.) Subsequent testing by the Cashmere and Camel Hair Manufacturer's Institute ("CCHMI"), showed that another Cashmerino variety, Cashmerino Chunky, contained no cashmere. (Id.)

The cashmere content of the Debbie Bliss Cashmerinos was widely discussed in the yarn trade during the June 10-12, 2006, trade show in Indianapolis, Indiana. (Id. ¶ 45.) A rumor reached Plaintiff's place of business on July 6, 2006, that a hand knitting yarn, identified only as spun of 55% merino wool, 33% microfiber and 12% cashmere, contained no cashmere content. Plaintiff's staff recognized this content fiber to match exactly that of the Debbie Bliss Cashmerino Aran and Cashmerino Baby yarns inventoried by Plaintiff. (Id. ¶ 46.)

Within hours of hearing the rumor, and upon advice of legal counsel, Plaintiff removed from sale the two Debbie Bliss Cashmerino yarns suspected of being mislabeled. (Id. ¶ 48.) Although KFI had previously terminated its relationship with Plaintiff, substantial quantities of both products remained in Plaintiff's inventory and were available for sale to consumers. (Id.) Concurrently, one of Plaintiff's principals inquired of CCHMI to substantiate the rumor. (Id. ¶ 49.) Karl Spilhaus, President of CCHMI, confirmed the authenticity of the analysis and ensuing report, and opined that all yarns labeled with the exact proportionate fiber content were suspect, but he would not identify the yarn tested. (Id.) Following this discussion, Plaintiff identified seven inventoried yarns labeled as spun of cashmere, with five sourced from KFI, and removed from sale a stock of 194 balls of Cashmerinos DK. (Id. ¶ 50.) Before the close of business on July 6, 2006, Plaintiff removed from sale another two yarns, and later a third yarn, supplied by KFI, spun with a cashmere content. (Id. ¶ 51.)

The next business day, Plaintiff estimated the retail value of the five KFI-sourced yarns removed from sale as approaching $20,000, and decided that the yarns would remain off-sale until Plaintiff could verify the fiber content. (Id. ¶ 52.) Also on July 7, Plaintiff contacted Cascade Yarns, which initiated CCHMI's testing, to determine which Debbie Bliss Cashmerino was analyzed by CCHMI. (Id. ¶ 53). Plaintiff learned that it was Debbie Bliss Cashmerino Chunky, a yarn not inventoried by Plaintiff. (Id.)

On July 9, 2006, Plaintiff requested that KFI and all vendors of wool products furnish a Guaranty of Compliance that wool yarns sourced from each vendor did in fact comply with labeling laws. (Id. ¶ 54.) KFI was the sole vendor who neither acknowledged nor fulfilled this request. (Id.) Three days later, Plaintiff submitted the five suspect yarns sourced from KFI to K.D. Langley Fiber Services for analysis of fiber content. (Id. ¶ 55.) Qualitative testing of the three Cashmerino yarns at issue revealed that "no cashmere fibers were observed" and each had no more than a zero percentage of cashmere. (Id. ¶ 56.) Indeed, Cashmerino Aran was actually spun with a fiber content of 57% wool and 43% acrylic. (Id.)

On July 18, 2006, Cascade Yarns electronically released a general letter to its customers regarding the testing of the cashmere content of the Debbie Bliss Cashmerinos. (Id. ¶ 57.) The following day, Cascade Yarns fulfilled Plaintiff's request that it provide copies of all correspondence on the Cashmerino labeling issue between Cascade Yarns and KFI. (Id. ¶ 58.)

### E. The Purported Cover-Up

Defendant Mr. Elalouf, allegedly aware of potential problems resulting from the fiber analysis, entered into an agreement with Designer Yarns to publicly claim that the Cashmerinos, since their introduction in 2001, always contained the requisite quantity of

7

cashmere. (Id. ¶¶ 59-60.) KFI thus provided Cascade Yarns with copies of reports of four fiber analyses purportedly performed on the Cashmerino Aran and suggested that the competitors "put this unfortunate episode" to rest "for the good of the industry." (Id. ¶ 61.) According to the Complaint, Mr. Elalouf and Designer Yarns enlisted Filatura Pettinata's assistance in this alleged scheme, whereby Filatura Pettinata would produce in Italy three small wraps of semi-finished yarn purposely spun with cashmere, which it would send to Designer Yarns specifically for testing by others. (Id. ¶ 62.) In addition, Filatura Pettinata would manufacture, specifically for testing purposes, small quantities of a fully finished yarn of an indeterminate cashmere content, to be sent to Designer Yarns, knowing that such small quantities would be subjected to expert fiber analyses that would then be disseminated within the industry. (Id.)

On approximately June 20, 2006, after Designer Yarns received from Filatura Pettinata the three small wraps of yarn, it enlisted Wharfdale Fibres, Ltd., a Keighley, England rag merchant, to secure an expert opinion about the cashmere content of the wraps. (Id. ¶ 63.) Perry Pucher, Wharfdale's principal, thereafter presented the wraps to David Lee, a principal of Cashmere Fibres, International, located in Bradford, England. (Id. ¶ 63.) Lee introduced Poucher to Julie Smith, who learned that a determination of the wraps' cashmere content was needed in the United States, where a question had recently arisen about the cashmere content in hand knitting yarns. (Id. ¶ 64.) She also understood that K.D. Langley Fibre Services in the United States had determined that there was no cashmere in the tested samples, but that finished balls of yarn were not available in England for Ms. Smith's testing. (Id. ¶ 64.)

As a favor to a friend of a friend, Ms. Smith performed an informal, private analysis of the three small wraps. The following day, she faxed her findings to Wharfdale Fibres,

8

which re-faxed the Smith report to Designer Yarns. (Id. ¶ 65.) On June 26, 2006, Designer Yarns sent Mr. Elalouf a version of Miss Smith's June 20 report, which Designer Yarns either knew or should have known would be published to others by Mr. Elalouf in his efforts to support his claim of cashmere in the Cashmerinos. (Id.)

More than two weeks later, Designer Yarns furnished sample balls of the Bliss Cashmerino Aran to another testing company, TFT. TFT's report of a qualitative fiber analysis indicated the presence of a "quantity of cashmere" in that yarn. (Id. ¶ 66.) That same day, July 7, Designer Yarns faxed the TFT report to Mr. Elalouf.

On July 20, 2006, Defendant Jeffrey Denecke of KFI mailed to hundreds of speciality yarn stores "KFI's official response to the Cascade mailing," e-mailed the letter to retail yarn shops for which KFI possessed e-mail addresses, and electronically published his letter and the Elalouf attachment in *Knitter's Review*." (Id. ¶ 67.) Attached to Denecke's correspondence was a letter authored by Sion Elalouf, assuring "that Debbie Bliss's Cashmerino yarn contains cashmere," questioning the reliability of the Langley analysis, questioning the cashmere content of as many as twenty-five cashmere yarns distributed by KFI's competitors, and stating that KFI was "anxious to furnish" retailers "whatever information you need to put your mind at ease." (Id. ¶¶ 68-69.)

In response, Plaintiff again requested that KFI provide a Wool Products Guaranty of Compliance. (Id. ¶ 69.) KFI instead offered to furnish a general letter at some uncertain, future point. (Id.) Because of KFI's allegation that the Langley report was unreliable, Plaintiff undertook secondary testing by another independent fiber analysis of the three Cashmerino products. (Id.) A duplicate sample of the same three yarns drawn from identical dyelots used by

9

Mr. Langley was provided to Specialized Technology Resources, Inc., which, on August 31, 2006, reported substantially identical results to those achieved by Mr. Langley. (Id. ¶ 70.) Under the advice of counsel, Plaintiff removed from sale two previously non-suspect yarns precisely matching yarns rumored to be not being spun of cashmere, and submitted samples of the same for fiber analysis. (Id. ¶ 71.)

### F. The Recall of the Defective Yarns

On September 26, 2006, KFI distributed a letter to specialty yarn retailers, purportedly authored by Debbie Bliss, expressing her sadness and distress from rumors that Cashmerinos are spun with no cashmere, and indicating her "complete confidence" that the yarns do indeed contain the labeled cashmere content. (Id. ¶ 72.) Likewise, Jay Opperman traveled to retailers in New York to assure them that there is cashmere in the Cashmerinos, as indicated by the KFI-issued test reports. (Id. ¶ 73.)

Nonetheless, at least five separate and independent analyses of Cashmerino yarns from KFI revealed that the yarns were not spun with any cashmere. (Id. ¶ 74.) On October 16, 2006, Plaintiff publicly announced the recall of the three Cashmerino yarns, and the recall of another three allegedly improperly labeled cashmere content yarns – all sourced from KFI. (Id. ¶ 75.) On October 19, 2006, Mr. Denecke electronically published an open letter to *Knitter's Review*, calling the recall a publicity stunt and a "smear campaign targeting KFI's products." (Id. ¶ 76.)

On September 2, 2008, Plaintiff initiated the current litigation claiming that, as a consequence of the false labeling of the three Cashmerino yarns at issue,[2] its business and commercial interests were harmed. (Id. ¶ 82.) Its Complaint sets forth several causes of action, including: (1) breach of the express warranty of merchantability (id. ¶¶ 83-91); (2) breach of the implied warranty of merchantability (id. ¶¶ 92-98); (2) false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) (id. ¶¶ 99-108); (4) injury to business and property pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962 (id. ¶¶ 109-120); (5) conspiracy to cause injury to business and property pursuant to RICO (id. ¶¶ 121-135); (6) perfidious trade practices (deceit) under the common law of unfair competition (id. ¶¶ 136-142); and (7) piercing the corporate veil. (Id. ¶¶ 143-150.) In response, Moving Defendants filed this Motion to Dismiss on September 24, 2008.

## II. STANDARD OF REVIEW ON MOTION TO DISMISS

The purpose of a Fed. R. Civ. P. 12(b)(6) motion is to test the legal sufficiency of a complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6); see also Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005). The question before the court is not whether the plaintiff will ultimately prevail. Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984). Rather, the court should only grant a 12(b)(6) motion if "it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (citing

---

2. The other recalled cashmere-blend yarns are the subject of another federal complaint filed by Plaintiff against both the Moving Defendants in this case and the Japanese manufacturer of those yarns. See The Knit With v. Eisaku Noru & Co., Ltd., Civ. A. No. 08-4775 (E.D. Pa. 2008).

11

Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957)). When considering a motion to dismiss, the court must "accept as true allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the nonmoving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). The court, however, will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

### III. DISCUSSION

In their Motion, Moving Defendants argue that the Complaint must be dismissed in its entirety on several grounds. First, they contend that Plaintiff has failed to establish standing sufficient to pursue its Lanham Act claim. Second, they assert that Plaintiff's RICO claims are time barred under the applicable statute of limitations and, alternatively, fail to allege a causal nexus. Finally, they argue that, with the dismissal of all of Plaintiff's federal claims, no basis remains for the Court to assert federal subject matter jurisdiction over the remaining state law claims. The Court addresses each argument individually.

#### A. The Lanham Act Claims

Count III of Plaintiff's Complaint alleges that Defendant KFI falsely advertised the fiber content of the three Cashmerino yarns at issue, which were supplied to Plaintiff for resale to consumers in the ordinary course of Plaintiff's business. (Compl. ¶ 101.) It asserts that this false advertising has caused confusion and deception of both retailers and consumers and has injured Plaintiff's commercial interests, in violation of the Lanham Act, 15 U.S.C. §

1125(a)(1)(B).³ (Id. ¶¶ 99, 103, 105.) Moving Defendants do not, at this juncture, challenge the underlying merits of this claim. Rather, they argue that Plaintiff fails to possess the "reasonable interest" necessary to meet the requirements for standing under the Lanham Act.

The question of standing "involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." Bennett v. Spear, 520 U.S. 154, 162, 117 S. Ct. 1154, 1161 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205 (1975). The constitutional component of standing, which stems from Article III of the United States Constitution, requires that a plaintiff demonstrate (1) that he or she suffered an "injury in fact;" (2) that the injury is "fairly traceable" to the actions of the defendant; and (3) that the injury

---

3. Under section 43(a) of the Lanham Act:

> 1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
>
> * * *

15 U.S.C. § 1125(a). To state a false advertising claim pursuant to this section, a plaintiff must allege: (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the plaintiff has been, or is likely to be, injured as a result of the false advertising. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citations omitted).

"will likely be redressed by a favorable decision." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136-37 (1992) and Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 471-72, 102 S. Ct. 752, 757-59 (1982)).

Prudential standing, on the other hand, consists of "a set of judge-made rules forming an integral part of 'judicial self-government.'" Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg., Inc., 197 F.3d 83, 87 (3d Cir. 1999) (quoting Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 225 (3d Cir. 1988) (internal quotations omitted)). Prudential standing embraces the following principles:

> (1) the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties; (2) even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances pervasively shared and most appropriately addressed in the representative branches; and (3) the plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, 140 F.3d 478, 485 (3d Cir. 1998) (internal quotation marks and citations omitted). "These requirements are designed to 'limit access to the federal courts to those litigants best suited to assert a particular claim.'" Gen. Instrument Corp., 197 F.3d at 87 (quoting Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804, 105 S. Ct. 2965, 2970 (1985)).

Congress may expressly confer standing via statutory enactment, thus superseding prudential standing concerns. Id. In passing the Lanham Act, however, "Congress did not

expressly negate [the] prudential standing doctrine." Conte Bros, 165 F.3d at 227. Accordingly, "as a matter of statutory interpretation," the background prudential standing principles are presumed to apply to a case brought under Section 43(a) of the Lanham Act. Gen. Instrument Corp., 197 F.3d at 87.

The Third Circuit initially addressed Section 43(a)'s prudential standing requirement in Thorn v. Reliance Van Co., Inc., 736 F.2d 929 (3d Cir. 1984). It held that a party has prudential standing to bring a claim under Section 43(a) if the "'party has a reasonable interest to be protected against false advertising.'" Id. at 933 (quoting Smith v. Montoro, 648 F.2d 602, 608 (9th Cir. 1981)). Although the court declined to precisely define the term "reasonable interest," it determined that, on its face, section 43(a) permits two classes of people to sue: (1) direct competitors doing business in the locality and (2) non-competitors who "believe they are somehow damaged by the [defendant's] false representations." Id. at 931. The allegations by the plaintiff – a forty-five percent shareholder in the defendant company – that his investment was impaired due to the defendant's false advertising campaign, were "sufficient[ly] direct" to satisfy prudential standing. Id. As the court explained, plaintiff was effectively a "surrogate" for a direct competitor, and thus possessed the "reasonable interest" necessary to satisfy prudential standing concerns. Conte Bros., 165 F.3d at 231 (discussing Thorn).

Thereafter, in Serbin v. Ziebart Int'l. Corp., Inc., 11 F.3d 1163 (3d Cir. 1993), the Third Circuit clarified which parties are proper plaintiffs under section 43(a). In that case, a group of consumers who purchased rust protection coverage for their automobiles, in reliance on the defendant company's allegedly false advertising, brought suit against the company under the Lanham Act. Id. at 1165. The court considered the question of whether consumers possess a

reasonable interest to be protected against false advertising. Id. at 1177. Finding in the negative, the court held that "'[t]he Lanham Act is primarily intended to protect commercial interests,' and that 'section 43(a) of the statute provides a private remedy to a commercial plaintiff who meets the burden of proving that its commercial interests have been harmed by a competitor's false advertising.'" Id. (quoting Sandoz Pharms. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 230 (3d Cir. 1990)). Although the court reaffirmed that it was not limiting section 43(a) to direct competitors, id., it excluded consumers from the class of plaintiffs with prudential standing under the Lanham Act. Id. at 1178-79.

Finally, in Conte Bros. Auto., Inc. v. Quaker-State Slick 50, Inc., 165 F.3d 221 (3d Cir. 1988), the Third Circuit created a workable judicial test for deciding whether a party has prudential standing under Section 43(a). In that case, "a putative nationwide class of retail sellers of motor oil and other engine lubricants that purportedly compete[d] with Slick 50, a Teflon-based engine lubricant manufactured by [defendants]" brought suit alleging that the defendants "falsely advertised that the addition of Slick 50 would reduce the friction of moving parts, decrease engine wear, and improve engine performance efficiency." Id. at 223-24. The question before the court was "whether retailers have standing under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1994) to bring false advertising claims against manufacturers of products that compete with those the retailers sell." Id. at 223. In an effort to determine whether the plaintiffs had a "reasonable interest," giving them prudential standing under the Lanham Act, the Third Circuit considered the following five factors:

> (1) The nature of the plaintiff's alleged injury: Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of the [Lanham Act]"?

(2) The directness or indirectness of the asserted injury.

(3) The proximity or remoteness of the party to the alleged injurious conduct.

(4) The speculativeness of the damages claim.

(5) The risk of duplicative damages or complexity in apportioning damages.

Id. at 233 (citations omitted).

Applying these factors, the Conte Bros. court determined that the plaintiffs lacked standing since (1) the type of injury – consisting of loss of retail sales from false advertising – was remote and not the type the Lanham Act sought to redress; (2) the damages were speculative and avoidable; and (3) recognition of the right of every potentially injured party in the distribution chain to bring a Lanham Act claim would subject the defendant company to multiple liability for the same conduct. Id. at 234-35. Ultimately, the court concluded that "while there may be circumstances in which a non-competitor may have standing to sue . . ., the focus of the Lanham Act is on '*commercial* interests [that] have been harmed by a competitor's false advertising,' . . . and in 'secur[ing] to the business community the advantages of reputation and good will by preventing their diversion from those who have created them to those who have not.'" Id. at 234 (internal quotations omitted). Although the plaintiffs had identified a commercial interest, they had neither alleged competitive harm nor shown that their good will or reputation had been directly injured. Id.

In light of this jurisprudence, and in response to Moving Defendants' challenge to its standing, Plaintiff effectively proffers two bases on which it asks the Court to recognize its

prudential standing. First, Plaintiff contends that where, as here, the Complaint, on its face, readily indicates a plaintiff's discernible reasonable commercial interest in protection against false advertising, the Conte Bros. Test does not apply. (Pls.' Sur-reply Br. 2.) Second, Plaintiff avers that, even applying the five Conte Bros. factors, it is vested with prudential standing to pursue its Lanham Act claim. (Id.) The Court addresses each argument individually.

### 1. Whether the Complaint Alone Establishes Plaintiff's Prudential Standing

Plaintiff claims that it possesses standing because the Complaint states facts which disclose or from which a Court can infer Plaintiff's "reasonable interest." It rests this purported "reasonable interest" on two theories. First, it asserts that due to its "direct proximate relationship" with Defendant KFI, the Complaint "facially discloses a commercial plaintiff [that] has suffered harm to its commercial interests by another having falsely advertised . . . its own products through the false claim of a significant presence of cashmere in the fiber content of the three Cashmerino products at issue." (Id. at 8.) Second, while effectively conceding that no direct horizontal competitor relationship exists, Plaintiff claims to maintain a "reverse vertical competition" relationship with Defendant KFI. (Pl's Sur-reply Br. 5-8.) According to Plaintiff, such relationships alone confer standing on it to pursue a false advertising Lanham Act claim against Defendant KFI, negating any need for application of the Conte Bros. five factor analysis. (Id.)

Plaintiff's arguments, however, find no support in the prevailing jurisprudence. As a principal matter, Plaintiff cites to – and this Court finds – no cases within the Third Circuit[4] that even remotely substantiate its contention that the Conte Bros. analysis has no bearing in the face of a complaint that adequately discloses standing. Indeed, in Conte Bros., the Third Circuit expressly rejected any type of categorical approach to prudential standing. Id. at 235. The plaintiff retailers, in that case, alleged that they were in direct vertical competition with the defendant manufacturer, who sold its competing products directly to end users, and, thus, they had standing. Id. The court dismissed this contention, reasoning that "standing under the Lanham Act does not turn on the label placed on the relationship between the parties," whether it be a directly competitive relationship or a more attenuated relationship. Id. at 235. In doing so, it explicitly reiterated that the five-factor analysis must be to determine prudential standing under the Lanham Act.

Since Conte Bros., the Third Circuit has reaffirmed the validity of the five factor test, giving no one factor determinative weight. See Joint Stock Soc'y v. UDV North Am., Inc., 266 F.3d 164, 180 (3d Cir. 2001). District courts within this Circuit, faced with a Lanham Act claim in a variety of commercial relationships, have repeatedly engaged in the Conte Bros. analysis. See, e.g., Nevyas v. Morgan, 309 F. Supp. 2d 673, 677-80 (E.D. Pa. 2004) (Lanham Act claim by doctor against former patient for allegedly defamatory remarks transmitted via an internet website by the patient; Cook Drilling Corp. v. Halco Am., Inc., Civ. A. No. 01-2940,

---

4. To date, only the Third, Fifth and Eleventh Circuits apply the Conte Bros. test. See Conte Bros., 165 F.3d at 233-34; Proctor and Gamble Co. v. Amway Corp., 242 F.3d 539, 562-64 (5th Cir. 2001); Phoenix of Broward, Inc. v. McDonald's Corp., 489 F.3d 1156, 1163 (11th Cir. 2007). Other circuits have applied a more categorical approach. See Am. Ass'n of Orthodontists v. Yellow Book U.S.A., Inc., 434 F.3d 1100, 1104 (11th Cir. 2006) (noting circuit conflict and citing cases applying categorical approach).

2002 WL 84532, at *2 (E.D. Pa. Jan. 22, 2002) (Lanham Act claim by commercial rock drilling company against manufacturer of air hammer, alleging false advertising of hammer); Schmidt, Long & Assoc., Inc. v. Aetna U.S. Healthcare, Inc., Civ. A. No. 00-3683, 2001 WL 856946, at *10 (E.D. Pa. Jul. 26, 2001) (Lanham Act claim by health benefit pan against auditor of health plans for disseminating false representations of fact about health plans operations to potential clients of auditor). Indeed, even in cases clearly disclosing a plainly "competitive harm," courts, both within and outside the Third Circuit, have nonetheless applied the Conte Bros. factors to analyze a prudential standing challenge. See, e.g., Phoenix of Broward, Inc. v. McDonald's Corp., 489 F.3d 1156, 1163 (11th Cir. 2007) (expressly rejecting the categorical approach and adopting Conte Bros. analysis in Lanham Act claim by fast food restaurant franchisee against franchisor's competitor); Pernod Ricard USA LLC v. Bacardi USA, Inc., 505 F. Supp. 2d 245, 253 (D. Del. 2007) (using Conte Bros. analysis to find standing between competing alcoholic beverage distributors, one of whom alleged competitive injury in rum sales due to other competitor's false marketing of its "Havana Club" brand rum); Alphamed Pharms. Corp. v. Arriva Pharms., 391 F. Supp. 2d 1148 (S.D. Fl. 2005) (applying Conte Bros. approach where biopharmaceutical company sued competitor for dissemination of false reports to investors regarding particular drug).

Even assuming *arguendo* that a categorical approach could or should apply, the Court cannot find any "reasonable interest" or competitive relationship on the face of the Complaint clearly conferring prudential standing on Plaintiff. Plaintiff theorizes that its "direct proximate relationship" with Defendant KFI plainly discloses its "openly discernible reasonable interest in the false advertising of the products at issue." (Pl.'s Resp. Mot. Dismiss 5.) In