## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE KNIT WITH, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KNITTING FEVER, INC., | : | |
| DESIGNER YARNS, LTD., | : | |
| FILATURA PETTINATA V.V.G. DI | : | |
| STEFANO VACCARI & C., SION | : | NO.  08-4221 |
| ELALOUF, DIANE ELALOUF, JEFFREY | : | |
| J. DENECKE, JR., JAY OPPERMAN, and | : | |
| DEBBIE BLISS, | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| THE KNIT WITH, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EISAKU NORO & CO., LTD., | : | |
| KNITTING FEVER, INC., | : | |
| SION ELALOUF, DIANE ELALOUF, | : | NO.  08-4775 |
| and JAY OPPERMAN, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM</u>

BUCKWALTER, S.J.                                                                           March 10, 2011

Currently pending before the Court are Motions to Dismiss filed by Defendant Filatura

Pettinata V.V.G. Di Stefano Vaccari & C. ("Filatura") and Defendant Designer Yarns, Inc.

("Designer Yarns") (collectively "Moving Defendants").  For the reasons which follow, the Motion

to Dismiss by Defendant Designer Yarns is granted, and the Motion to Dismiss by Defendant

Filatura is granted in part and denied in part.

## I.      FACTUAL AND PROCEDURAL HISTORY

The factual background of this case is one familiar to both the parties and the Court and has been reiterated in several of this Court's prior opinions.[1]  This matter arises between Plaintiff, The Knit With ("The Knit"), a small, family-owned and operated business retailing specialty yarns and accessories to consumers, Defendant Knitting Fever, Inc. ("KFI"), a New York corporation that imports and distributes specialty yarns, and Defendants Filatura, Debbie Bliss, and Designer Yarns, all of whom are non-U.S. entities that design, manufacture, and/or distribute speciality yarns.  At the core of the dispute is Plaintiff's claim that KFI sold designer knitting yarns to The Knit, representing that the yarns contained a percentage of cashmere, which they allegedly did not.

Plaintiff initiated litigation against KFI, its officers/directors, Filatura, Designer Yarns, and Debbie Bliss alleging that, as a consequence of the false labeling of three of the six Cashmerino yarns at issue, its business and commercial interests were harmed.  (Compl., The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221 (E.D. Pa. Sep. 2, 2008) ("The Knit With I").)  The Complaint set forth several causes of action, including:  (1) breach of the express warranty of merchantability; (2) breach of the implied warranty of merchantability; (3) false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (4) injury to business and property pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962; (5) conspiracy to cause injury to business and property pursuant to RICO; (6) perfidious trade practices (deceit) under the common law of unfair competition; and (7) piercing the corporate veil.  (Id. ¶¶ 82-150.)

---

[1]  The facts were fully summarized in two December 2008 decisions and, in lieu of repeating them here, the Court incorporates them by reference.  See The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2008 WL 5381349, at *1-6 (E.D. Pa. Dec. 18, 2008); The Knit With v. Eisaku Noro, No. CIV.A. 08-4775, 2008 WL 5273582, at *1-3 (E.D. Pa. Dec. 18, 2008).

Defendants Knitting Fever, Inc., Sion Elalouf, Diane Elalouf, Jeffrey Denecke, and Jay Opperman (collectively, the "KFI Defendants") moved, on September 24, 2008, to dismiss the third, fourth, and fifth counts.

On October 6, 2008, prior to the resolution of this motion to dismiss, Plaintiff initiated a second litigation against the KFI Defendants, also including as Defendants the Japanese manufacturers of the remaining three Cashmerino yarns at issue.  (Compl., The Knit With v. Eisaku Noro & Co., Ltd., No. CIV.A.08-4775 (E.D. Pa. Oct. 6, 2008) ("The Knit With II").)  The Complaint in that case set forth the following causes of action:  (1) breach of express warranty of merchantability of goods for resale to consumers; (2) breach of implied warranty of merchantability of goods for resale to consumers; (3) explicitly false advertising pursuant to the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (4) perfidious trade practices and common law unfair competition; (5) civil conspiracy; and (6) piercing the corporate veil.  The KFI Defendants filed another motion to dismiss with respect to The Knit With II.  (Id. ¶¶ 35-82.)

On December 18, 2008, this Court, in The Knit With I, granted the motion to dismiss the Lanham Act claim on standing grounds, but declined to dismiss the RICO claims.  The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2008 WL 5381349, at *1-6 (E.D. Pa. Dec. 18, 2008).  The following day, the Court also dismissed the Lanham Act claim in The Knit With II.  The Knit With v. Eisaku Noro and Co., Ltd., No. CIV.A.08-4775, 2008 WL 5273582 (E.D. Pa. Dec. 19, 2008).  By way of Order dated December 23, 2008, the Court consolidated both actions under the first civil action number.

Following the KFI Defendants' submission of their Answer and Counterclaims for defamation, tortious interference with existing and prospective contracts, and trade libel, Plaintiff moved, on January 22, 2009, to dismiss all counterclaims and strike all affirmative defenses.  The

Court struck the KFI Defendants' fifth affirmative defense, but denied the motion in all other respects.  The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2009 WL 973492 (E.D. Pa. Apr. 8, 2009).  Thereafter, via a Motion for Judgment on the Pleadings filed on July 15, 2009, the KFI Defendants sought to dismiss Plaintiff's RICO, deceit, and conspiracy claims.  The Court declined to dismiss the RICO claims, but granted judgment on the pleadings on both the deceit and conspiracy claims.  The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2009 WL 3427054 (E.D. Pa. Oct. 20, 2009).  Plaintiff's sole remaining claims in this case are the RICO and breach of warranty actions.

        In early May 2010, Plaintiff moved for a default judgment against Defendants Filatura, Designer Yarns, and Debbie Bliss, who, throughout this entire course of events, had never entered appearances.  Defendant Filatura countered, on May 12, 2010, with a Motion to Dismiss for insufficient service.  That same day, the Clerk of this Court entered defaults against Defendants Debbie Bliss and Designer Yarns.  On May 14, 2010, these two latter Defendants moved to reopen the defaults against them and also filed Motions to Dismiss for insufficient service identical in nature to the one filed by Filatura.  The following July, the Court set aside defaults, found that none of the three foregoing Defendants had been properly served, and granted Plaintiff sixty days to properly serve these Defendants.  The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2010 WL 2788203 (E.D. Pa. July 23, 2010).  Following Plaintiff's successful service of only Debbie Bliss and new rounds of motions to dismiss by all three non-U.S. Defendants, the Court dismissed the Complaint against Debbie Bliss for failure to state a claim upon which relief may be granted.  The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2010 WL 4909929 (E.D. Pa. Dec. 1, 2010). As to Defendants Filatura and Designer Yarns, however, the Court ordered them to accept an alternate form of service from Plaintiff.  The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221,

2010 WL 4977944 (E.D. Pa. Dec. 7, 2010).

On January 6, 2011, both Filatura and Defendant filed Motions to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted.  Plaintiff responded by way of two separate briefs filed on January 27, 2011.  On February 8, 2011, the Moving Defendants filed Reply Briefs, making this matter ripe for the Court's consideration.

## II.     STANDARD OF REVIEW

Under Rule 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  It emphasized that it would not require a "heightened fact pleading of specifics," but only "enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

Following the basic precepts of Twombly, the Supreme Court, in the subsequent case of Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), enunciated two fundamental principles applicable to a court's review of a motion to dismiss for failure to state a claim.  First, it noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 1949.  Thus, although "[Federal] Rule [of Civil Procedure] 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id.  at 1950.  Second, the Supreme Court emphasized that "only a complaint that

5

states a plausible claim for relief survives a motion to dismiss." Id.  "Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." Id.  The Supreme Court

explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for
> more than a sheer possibility that a defendant has acted unlawfully.  Where a
> complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Id. at 1949 (citing Twombly, 550 U.S. at 556-57).

Expanding on the Twombly/Iqbal standards, the United States Court of Appeals for the

Third Circuit succinctly summarized the two-prong analysis to be undertaken by district courts

during a Rule 12(b)(6) review:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim,
> district courts should conduct a two-part analysis.  First, the factual and legal
> elements of a claim should be separated.  The district court must accept all of the
> complaint's well-pleaded facts as true, but may disregard any legal conclusions.
> Second, a district court must then determine whether the facts alleged in the
> complaint are sufficient to show that the plaintiff has a "plausible claim for relief."
> In other words, a complaint must do more than allege the plaintiff's entitlement to
> relief.  A complaint has to show such an entitlement with its facts.  As the Supreme
> Court instructed in Iqbal, where the well-pleaded facts do not permit the court to
> infer more than the mere possibility of misconduct, the complaint has alleged – but
> it has not shown – that the pleader is entitled to relief.  This plausibility requirement
> will be a context-specific task that requires the reviewing court to draw on its judicial
> experience and common sense.

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations omitted).

Notwithstanding the foregoing, nothing in Twombly, Iqbal, or Fowler altered some of the

fundamental underpinnings of the Rule 12(b)(6) standard of review.  Arner v. PGT Trucking, Inc.,

No. CIV.A.09-565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); Spence v. Brownsville Area

6

<u>Sch. Dist.</u>, No. CIV.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008).  Federal Rule of

Civil Procedure 8 still requires only a short and plain statement of the claim showing that the

pleader is entitled to relief and need not contain detailed factual allegations.  Fᴇᴅ. R. Cɪᴠ. P. 8;

<u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 233 (3d Cir. 2008).  Further, the court must "accept

all factual allegations in the complaint as true and view them in the light most favorable to the

plaintiff."  <u>Buck v. Hampton Twp. Sch. Dist.</u>, 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court

must "determine whether, under any reasonable reading of the complaint, the plaintiff may be

entitled to relief."  <u>Pinkerton v. Roche Holdings Ltd.</u>, 292 F.3d 361, 374 n.7 (3d Cir. 2002); <u>see</u> <u>also</u>

<u>Mayer v. Belichick</u>, 605 F.3d 223, 229-30 (3d Cir. 2010).

## III.    DISCUSSION

Two separate substantive claims against the two Moving Defendants are at issue in the

present Motions.  First, Plaintiff alleges a conspiracy claim pursuant to the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), against both Defendant Designer Yarns

and Defendant Filatura.  Second, Plaintiff contends that Defendant Filatura breached the implied

warranty of merchantability.  The Court addresses each cause of action individually.

### A.    <u>RICO Conspiracy Claim</u>

Plaintiff first asserts that Designer Yarns and Filatura participated in an unlawful RICO

conspiracy.  In response, both Defendants contend that Plaintiff has failed to allege particularized

factual allegations demonstrating that they knowingly agreed either to participate in the alleged

conspiracy or to the commission of any RICO predicate acts.

Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate subsections

(a), (b), or (c) of RICO.  18 U.S.C. § 1962(d).  The essential elements of a § 1962(d) conspiracy

include:  (1) knowledge of the corrupt enterprise's activities and (2) agreement to facilitate those activities.  Salinas v. United States, 522 U.S. 52, 66 (1997); Rose v. Bartle, 811 F.2d 331, 366 (3d Cir. 1989).  Because there is no requirement of some overt act or specific act, the RICO conspiracy provision is even more comprehensive than the general conspiracy offense.  Salinas, 522 U.S. at 63.  Thus, "a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise."  Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001); see also Salinas, 522 U.S. at 64 ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."); Dongelewicz v. PNC Bank Nat'l Ass'n, 104 Fed. Appx. 811, 818 (3d Cir. 2004) (adopting Smith standard).  "In certain circumstances, a defendant may be held liable under § 1962(d) even where its own actions would not amount to a substantive RICO violation."  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 372 (3d Cir. 2010).  Nonetheless, "[u]nderlying a § 1962(d) claim is the requirement that plaintiff must show that defendants agreed to the commission of a 'pattern of racketeering.'"  Breslin v. Brainard, No. CIV.A.01-7269, 2003 WL 22351297, at *13 (E.D. Pa. Oct. 14, 2003) (quoting Banks v. Wolk, 918 F.2d 418, 421 (3d Cir.1990)), aff'd, 128 Fed. Appx. 237 (3d Cir. 2005).  The Third Circuit has emphasized that those who innocently provide services will not incur § 1962(d) liability; rather "liability will only arise from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity."  Smith, 247 F.3d at 538 n.11.

In light of these legal tenants, a RICO conspiracy complaint "must contain sufficient information for the court to determine whether or not a valid claim for relief has been stated and to enable the opposing side to prepare an adequate responsive pleading."  5 WRIGHT & MILLER, FED. PRAC. & PROC. CIV.3D § 1233 (3d ed. 2010).  "Although mere inferences from the complaint are

inadequate to establish the necessary factual basis . . . a court may look to any 'factual allegations of particular acts' within the complaint as a whole incorporated by the conspiracy claim to provide this basis." Rose, 871 F.2d at 336 (citations omitted).  The elements which must be pled to allege a RICO conspiracy claim include:  "(1) an agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate § 1962(a), (b), or (c)."  Odesser v. Cont'l Bank, 676 F. Supp. 1305, 1312 (3d Cir. 1987); see also In re Jamuna Real Estate, LLC, 416 B.R. 412, 428-29 (Bankr. E.D. Pa. 2009) (citing Rose, 871 F.2d at 366).  Further, a conspiracy claim must contain statements addressing "the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose."  Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1166 (3d Cir. 1989), abrogated on other grounds by Beck v. Prupris, 529 U.S. 494 (2000); see also Meeks-Owens v. Indymac Bank, F.S.B., 557 F. Supp. 2d 566, 573 (M.D. Pa. 2008) (noting that the above elements must be properly pled to set forth a § 1962(d) conspiracy).  These required supportive factual allegations "must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy."  Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989) (internal quotations and citations omitted).

To be clear, "allegations of conspiracy are not measured under the . . . [Fed. R. Civ. P.] 9(b) standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal . . . [Fed. R. Civ. P. 8(a)] pleading standard."  Odesser, 676 F. Supp. at 1313.  Nevertheless, it is not enough for a complaint to simply make "conclusory allegations of concerted action but [be] devoid of facts actually reflecting joint action."  Abbott v. Latshaw, 164 F.3d 141, 148 (3d Cir. 1998); see also District 1199P Health & Welfare Plan v. Janssen, L.P., Nos. CIV.A.06-3044, 07-2224, 07-2608, 07-2860, 2008 WL 5413105, at *15-16 (D.N.J. Dec. 23, 2008).  Moreover, "mere

inferences from the complaint are inadequate to establish the necessary factual basis." <u>Rose</u>, 871

F.2d at 366.   Rather, the "[p]laintiff must allege facts to show that each Defendant objectively

manifested an agreement to participate, directly or indirectly, in the affairs of a RICO enterprise

through the commission of two or more predicate acts." <u>Smith v. Jones, Gregg, Creehan & Gerace,</u>

<u>LLP</u>, No. CIV.A.08-365, 2008 WL 5129916, at *7 (W.D. Pa. Dec. 5, 2008).   "Bare allegations of

conspiracy described in general terms may be dismissed." <u>Id.</u>

In the present case, Plaintiff avers that both Defendant Designer Yarns and Defendant

Filatura participated in an unlawful RICO conspiracy.   In light of the fact-sensitive and

individualized nature of this claim, the Court considers each Defendant separately.

### 1.   Designer Yarns

Plaintiff's Complaint against Designer Yarns sets forth the following pertinent allegations:

5.   Corporate Defendant Designer Yarns, Ltd. . . . is believed to hold a license for the international marketing of handknitting yarns bearing the Debbie Bliss brandname and has a distributorship agreement with KFI by which KFI is the exclusive US importer/distributor of yarns marketed by Designer Yarns, Ltd. At all times relevant to this Complaint, Designer Yarns is a corporate creature believed to be effectively controlled by individual defendant Sion Elalouf.
. . .

31.   To implement the plan for a fully controlled 'designer' product, Sion Elalouf and Jay Opperman, with other persons not susceptible as defendants, created a company to hold the brandnames and distribution rights to 'designer yarns' – yarns to be branded with the names of recognized designers in the international handknitting yarn trade.   On April 12, 2001, in England, a certificate of incorporation . . . was issued to Designer Yarns, Ltd. . . . Thereafter, Designer Yarns is believed to have entered into agreements whereby:

a.)   KFI is the sole US importer-wholesaler of products manufactured for Designer Yarns; and

b.)   Debbie Bliss would license her name to brand yarns marketed as Debbie Bliss Yarns.

10

32.     Apparently to avoid if not evade US Customs scrutiny of import transactions between related parties, Mr. Elalouf is not disclosed as a shareholder, director or participant in Designer Yarns, Ltd.  Mr. Elalouf maintains access to Designer Yarns by way of Mr. Oppermans' equity and directorship roles – as apparently agreed to by Mr. Opperman, KFI's national sales manager.

33.     Upon information and belief, notwithstanding the absence of Mr. Elalouf's formal involvement in the corporate affairs of Designer Yarns, Ltd., he is intimately involved with and entirely controls Designer Yarns and the merchandising of its products – initially, the Debbie Bliss line but more recently products branded under license from other designers; most importantly, Mr. Elalouf ultimately determines:

   a.)   the specific products marketed internationally as manufactured for Designer Yarns;

   b.)   the fiber content of Designer Yarns' products;

   c.)   the pricing of such products; and

   d.)   the promotion and advertising of such products.

. . .

36.     . . . Plaintiff believes and avers that certainly before June 9, 2001 . . . Mr. Elalouf and Designer Yarns entered into an agreement to substitute the 0% cashmere version for the Cashmerino spun of 12% cashmere.  Thereafter,

   a.)   Alberto Oliaro, Pettinata V.V.G.'s principal officer was directed to manufacture the 0% cashmere yarn – through a spinner, more specifically known only to the Defendants – but label the finished product as spun on 12% cashmere;

   b.)   by processes and at a time more specifically uniquely within the Defendants' purview, but certainly by June 9, 2001, the zero-cashmere version of the Cashmerino was included in the new line of Debbie Bliss yarns to be launched by Designer Yarns;

   c.)   the zero cashmere version of the Cashmerinos was subsequently imported to the US for wholesale distribution by KFI under the Debbie Bliss brand from Designer Yarns and the K.F.I. brand – when Mr. Elalouf knew, or should have known, the Cashmerino version actually manufactured was spun of a 0% [zero percent] cashmere.

. . .

60.     Upon information and belief – to effect 'damage control' and to continue 'pulling the wool' over the trade concerning the cashmere content of the Cashmerinos – Mr. Elalouf and Designer Yarns agreed, after May 26, 2006 and certainly before June 20, to claim the Cashmerinos, since 2001, *always* contained the requisite quantity of cashmere (or, conversely, to cover-up the

absence of any cashmere content in the Debbie Bliss Cashmerino since 2001.

. . .

63.     After Designer Yarns received from V.V.G. the three small wraps of yarn, and on June 20, 2006, Designer Yarns enlisted Wharfedale Fibres, Ltd., a Keighley rag merchant, to secure expert opinion about the cashmere content of the three wraps; Perry Poucher, Wharfedale's principal:

   a.)   shortly after noon on June 20, personally presented the wraps to David Lee, a principal of Cashmere Fibres, International, located in Bradford, England;

   b.)   Lee observed Poucher withdraw from his pocket three small reelings for Lee's inspection;

   c.)   Lee suggested the reelings or wraps be subjected to microscopic fiber analysis;

   d.)   Lee recommended Poucher consult Julie Smith, who operates Quality Control Laboratory, a private fiber testing service in the same mill building housing Cashmere Fibres;

   e.)   whereupon Lee introduced Poucher to Julie Smith.

. . .

65.     Under these exceedingly unusual circumstances, and as a favor to a friend of a friend, Miss Smith performed an informal, private analysis of the three small wraps.  The next day she faxed her findings to Wharfedale Fibres which re-faxed the Smith report to Designer Yarns; on June 26, Designer Yarns knew, or should have known, Mr. Elalouf would publish to others for their reliance as supporting claims of cashmere in the Cashmerinos. . . .


66.     More than two weeks later, Designer Yarns furnished sample balls of the Bliss Cashmerino Aran to TFT, obtaining on July 7, 2006, TFT's report of a qualitative fiber analysis indicating the presence of but "a quantity of cashmere" in that yarn; that same day, Designer Yarns faxed the TFT report to Mr. Elalouf. . . .

. . .

126.    Designer Yarns, Ltd., between May 26, 2006 and certainly by June 20, 2006 and continuing for months thereafter, in reckless disregard of the truth, conspired with Mr. Elalouf and participated in the scheme described in ¶ 60

. . .

132.    Plaintiff believes and avers the corporate defendants Designer Yarns, Ltd. and Filatura Pettinata V.V.G. and the individual defendants Diane Elalouf, Debbie Bliss, Jay Opperman, and Jeffrey J. Denecke, Jr. conspired with Mr. Elalouf in the scheme alleged in ¶ 36 and the attempted cover-up, as alleged

12

in ¶ 60 of the absence of cashmere in the Cashmerino yarns.

133.   Plaintiff believes and avers the corporate defendants Designer Yarns, Ltd. and
       Filatura Pettinata V.V.G. and the individual defendants Diane Elalouf,
       Debbie Bliss, Jay Opperman and Jeffrey J. Denecke, Jr. participated in the
       attempt to cover-up, as alleged in ¶ 60, of the absence of cashmere in the
       Cashmerino yarns.

134.   Plaintiff believes and avers the corporate defendants Designer Yarns, Ltd. and
       Filatura Pettinata V.V.G. and the individual defendants Diane Elalouf,
       Debbie Bliss, Jay Opperman and Jeffrey J. Denecke, Jr. benefitted from the
       conspiracy alleged in ¶ 36 and its continuation as alleged in ¶ 60.

(Compl. ¶¶ 5, 31-33, 36, 60, 63, 65, 66, 126, 132-34.)  Plaintiff's December 23, 2009 RICO Case

Statement ("RICO Statement") then clarifies that Designer Yarns violated 1962(d) by

"[p]articipating in and facilitating a conspiracy to cover up the wholesale distribution of

handknitting yarns priced as spun with premium specialty fibers, such as cashmere."  (RICO

Statement ¶ 2; see also id. ¶ 11.)

Taking these allegations in the context of the entirety of the Complaint, two separate

schemes appear to come into play:  (1) a conspiracy between the KFI Defendants and Designer

Yarns to distribute mislabeled yarn – a scheme alleged to be carried out by the various predicate acts

of Sion Elalouf; and (2) a conspiracy between the KFI Defendants and the remaining Defendants to

cover up the initial fraudulent plans.

### a.   Scheme to Distribute Mislabeled Yarns

Considering first the alleged scheme to distribute mislabeled yards, the Court finds that

Plaintiff's claim contains precisely the type of "conclusory allegations of concerted action . . .

devoid of facts actually reflecting joint action" frowned upon by Twombly/Iqbal standards.  Abbott,

164 F.3d at 148.  Plaintiff initially asserts, upon belief only, that Designer Yarns is controlled by

13

Defendant Sion Elalouf.  (Compl. ¶¶ 5, 32.)  In support of this "belief," Plaintiff provides no factual

allegations from which any reasonable trier of fact could make an inference of any such connection.

Indeed, Plaintiff concedes that Mr. Elalouf is neither a shareholder, officer, director, nor participant

in Designer Yarns, but then surmises, with no obvious basis, that this was done "to avoid if not

evade US Customs scrutiny of import transactions between related parties."  (Id. ¶ 32.)  Although

Plaintiff asserts that Mr. Elalouf maintains access to Designer Yarns by way of his relationship with

Jay Opperman, who has "held himself out" as an "independent sales representative of KFI" and is a

director and one of two currently registered owners of Designer Yarns, (id. ¶ 9), Plaintiff does not

elaborate on this relationship to explain how it supports the conclusion that Mr. Elalouf is

"intimately involved with and entirely controls Designer Yarns."  (Id. ¶ 33.)  In short, nothing in the

entire Complaint offers any facts to bolster the conclusory allegation that Mr. Elalouf was in

complete control of Designer Yarns's marketed products, pricing decisions, and promotions and

advertising.

        Second, as to the purported agreement between Mr. Elalouf and Designer Yarns, Plaintiff

alleges only that Mr. Elalouf discovered a 0% cashmere-based cashmerino and that Plaintiff now

"believes and avers" that before June 9, 2001, "Mr. Elalouf and Designer Yarns entered into

agreement to substitute the 0% cashmere version for the Cashmerino spun of 12% cashmere."  (Id. ¶

36.)  Yet, aside from this legal conclusion of concerted action, the Complaint identifies no factual

bases upon which the Court can make the reasonable inference that the Elalouf and Designer Yarns

affirmatively and knowingly entered into some sort of plan or scheme to commit the requisite

predicate offenses.  The Complaint identifies no dealings between Elalouf or his company KFI and

Designer Yarns prior to the alleged "cashmere caper," and asserts nothing suggestive of any agreed

upon intent to fraudulently distribute mislabeled yarn.  As aptly argued by Defendant, merely

14

referring to the action as the "Elalouf-Designer" scheme "is not an acceptable substitute for factual

allegations demonstrating Designer Yarns's affirmative agreement to participate in a RICO

conspiracy."  (Def. Designer Yarns's Mot. Dismiss 3.)  Thus, the Complaint lacks any facts showing

that Designer Yarns "objectively manifested an agreement to participate, directly or indirectly, in the

affairs of a RICO enterprise through the commission of two or more predicate acts."[2]  Smith, 2008

WL 5129916, at *7.

     Finally, even assuming the existence of some agreement, Plaintiff's RICO conspiracy cause

of action against Designer Yarns is devoid of any allegations that would allow a plausible inference

that Designer Yarns had knowledge of the illegal or fraudulent nature of Mr. Elalouf's acts.[3]  The

---

[2]  Plaintiff argues that "by acknowledging the Cashmerino-type yarns as its own products,
Designer can be said to possess constructive knowledge of the nature and characteristics of its
products – specifically the Cashmerino-type yarns do not contain the labeled cashmere content."
(Pl.'s Resp. Designer Yarns Mot. to Dismiss 6.)  As Plaintiff concedes in its Complaint,
however, without expert fiber analysis, it is virtually impossible to confirm the presence or
absence of cashmere in a yarn.  (Compl. ¶ 34.)

[3]  Plaintiff's repeated references to the Wool Products Labeling Act ("WPLA"), 15 U.S.C. § 68,
et seq., as a basis for imputing knowledge to Designer Yarns are unavailing.  Plaintiff contends
that because the WPLA prohibits the introduction and sale of mislabeled wool products into U.S.
commerce, Designer Yarns can be deemed to have constructive knowledge prior to 2006 that the
Cashmerino-type yarns were mislabeled.  As this Court previously noted in response to
Defendant KFI's efforts to impute similar constructive knowledge to Plaintiff under the WPLA,
"[w]hile the statute clearly has a negative enforcement component prohibiting the manufacture,
introduction into commerce, sale, transportation, or distribution of any misbranded wool product,
the only affirmative obligation in the statute [to test the content of the yarns] rests with the parties
who 'manufactur[e] for introduction, or first introduc[e] into commerce a wool product.'"  The
Knit With, 2008 WL 5381349, at *19 (quoting 15 U.S.C. § 68c(a)).  Although a marketer, such
as Designer Yarns, may choose to risk liability for marketing misbranded yarns, nothing in the
statute creates an affirmative duty on such a marketer to test the products its sells.  Id.  As such,
the Court cannot find that Designer Yarns had constructive knowledge of the content of the
yarns.
     Second, even assuming the statute imposed a duty on marketers to test the fiber content of
their yarns, the statute explicitly provides that its provisions "shall be enforced by the Federal
Trade Commission under rules, regulations, and procedure provided for in the Federal Trade

Complaint sets forth a laundry list of predicate offenses, all of which were committed solely by Sion

Elalouf.  (Compl. ¶ 113.)  Remarkably absent from Plaintiff's lengthy and detailed Complaint,

however, is any particularized factual allegation of any communications between Designer Yarns

and Elalouf from which the Court can draw a reasonable allegation that Designer Yarns knew that

Elalouf's actions were part of an illegal pattern of racketeering activity.  Shearin, 885 F.2d at 1166-

67.  As such, any assistance by Designer Yarns to Mr. Elalouf in support of the mislabeling scheme

cannot be deemed to rise above the level of innocent participation.[4]

### b.      The Cover-up Scheme

Having thus found no plausible claim for Designer Yarns's knowing participation in any

conspiracy to illegally distribute mislabeled yarns, the Court is now hard-pressed to hold Designer

Yarns liable for the alleged scheme to "cover up" the prior fraud.  Plaintiff asserts that, "[u]pon

information and belief," to effect damage control, "Mr. Elalouf and Designer Yarns agreed"

sometime between May 26 and June 20, 2006 to claim the Cashmerinos "*always* contained the

---

Commission Act."  Id. § 68d.  Plaintiff has not brought to the Court's attention any finding of
misbranding or enforcement action by the Federal Trade Commission against Designer Yarns.
"Thus, [it] cannot credibly argue that [Designer Yarns] violated its obligations or acted
unreasonably in not discovering the misbranding . . . when the Federal Trade Commission itself
has made no such finding."  The Knit With, 2008 WL 5381349, at *20.

[4]  Plaintiff cites to Smith v. Berg, 247 F.3d 532 (3d Cir. 2001), for the proposition that Designer
Yarns did not need to have complete knowledge of the scope of KFI's corrupt activities.  The
Smith case, however, held only that "one who opts into or participates in a conspiracy is liable
for the acts of his co-conspirators which violate section 1962(c) even if the defendant did not
personally agree to do, or to conspire with respect to, *any* particular element."  Id. at 537.  In
other words, a substantive violation of section 1962 is not a prerequisite to liability for
conspiracy under § 1962(d).  Id.  Nothing in that case abrogated the well-established principle
that liability under § 1962(d) is available only for services "which were *purposefully and
knowingly* directed at facilitating a criminal pattern of racketeering activity."  Id. at 537 n.11
(emphasis added).  As such, those who innocently provide services without knowledge that they
are aiding a criminal pattern of racketeering will not incur liability.  Id.

requisite quantity of cashmere." (Compl. ¶ 60.)  The Complaint goes on to allege that Designer

Yarns obtained from the Italian broker, Filatura Pettinata, three small wraps of yarn and provided

them to third-party fiber analysts for testing.  (Id. ¶¶ 62-64.)  Once an independent analysis was

completed and showed a "quantity of cashmere," Designer Yarns forwarded a copy of the resulting

report to Mr. Elalouf in the United States knowing that Elalouf would publish it to others in support

of his claim of cashmere in the Cashmerinos.  (Id. ¶¶ 65-66.)

Aside from the fact that such allegations fail to imply Designer Yarns's knowledge that this

analysis was part of any alleged cover-up orchestrated by Elalouf – especially since the testing

showed cashmere in the yarns – Plaintiff's claim provides a legally insufficient basis on which to

hold Designer Yarns liable for participation in a RICO conspiracy.  As noted above, in order to state

a valid RICO claim, a plaintiff must plead sufficient facts indicating that the defendant engaged in a

"pattern" of racketeering activity. 18 U.S.C. § 1962(c).  The United States Supreme Court has

required plaintiffs to allege a "relationship" between the predicate acts (the "relationship

requirement") as well as a "threat of continuing activity" (the "continuity requirement") to illustrate

a "pattern of racketeering activity." H.J. Inc. v. NW. Bell Tel. Co., 492 U.S. 229, 239 (1989)

(internal quotation omitted).  The continuity requirement refers "either to a closed period of repeated

conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  Id.

at 242.

"Cover-ups may be sufficiently related to the underlying offense such that they form part of

the same pattern of racketeering activity." Mruz v. Caring, Inc., 991 F. Supp. 701, 717 (D.N.J.

1998).  The Supreme Court, however, has held that "a vital distinction must be made between acts

of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of

concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." Grunewald v. United States, 353 U.S. 391, 405 (1957). To become part of the underlying offense, the concealment must have been "expressly plotted . . . in advance of the substantive crimes," meaning the Plaintiff must have "'direct evidence [of] an express original agreement among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission.'" Pyramid Secs., Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1118 (D.C. Cir. 1991) (quoting Grunewald, 353 U.S. at 404). As a general rule, then, a conspiracy generally ends when the design to commit substantive misconduct ends; it does not continue "merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished." Grunewald, 353 U.S. at 405. A sister federal district court, addressing an analogous situation of predicate acts in furtherance of a fraud followed by a separate cover-up scheme, eloquently explained as follows:

> [A]t best, the facts suggest two separate instances of wrongdoing – the underlying agent fraud followed by an improper cover-up scheme. . . . Even assuming the [defendants'] clean-up activities were unlawful, the [defendants] cannot be liable for losses incurred in the . . . frauds [committed by their agents] (unlawful activity A) simply because they participated in the post-fraud cover-up (unlawful activity B). [Citation omitted]. The plaintiffs in this case lost their money in the first place because they were defrauded by [the defendants' agents] and a host of other former defendants. Plaintiffs did not lose their money because of the clean-up actions of defendants.

Albright v. Attorney's Title Ins. Fund, 504 F. Supp. 2d 1187, 1204 (D. Utah 2007).[5]

---

[5] See also Davis v. Grusemeyer, 996 F.2d 617, 626-27 (3d Cir. 1993) ("An attempt to cover up a completed scheme of criminal activity . . . does not constitute a predicate act in furtherance of a RICO conspiracy . . ."), abrogated on other grounds by Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644 (3d Cir. 1998); Barsam v. Pure Tech. Int'l, Inc., 864 F. Supp. 1440, 1450 (S.D.N.Y. 1994) (dismissing RICO claim because efforts at covering up whole fraudulent act are inadequate to satisfy continuity requirements).

The present Complaint attempts to assert a continuing pattern of racketeering connecting the original introduction of the allegedly mislabeled yarn in 2001 to the cover-up of those activities in 2006.  A reasonable reading of such allegations, however, reveals, at most, two separate acts of wrongdoing.  While the scheme to distribute mislabeled yarns, originally formulated and put into action in 2001, resulted in the continued distribution of such yarns to The Knit With well into 2005, (Compl. ¶ 113(a)(2)), the allegations of the Complaint clearly indicate that all predicate acts in furtherance of that scheme had ceased years earlier.  Indeed, the Complaint makes no mention of any substantive acts in furtherance of the distribution scheme occurring after 2004.[6]  Moreover, nothing in the Complaint implies the presence of any agreement made back in 2001 to jointly engage in cover-up activities in the event that the original scheme was discovered.  Finally, there are no factual allegations of cover-up activities prior to 2006.  Quite to the contrary, the Complaint explicitly admits that any plan to effectuate a cover-up was not formulated until sometime between May and June 2006 – immediately after a rumor began to spread in yarn industry about the fiber content of the yarns at issue, but years after the original plan to release the zero-percent cashmere yarns into the market.  (Compl. ¶ 60.)  "Attempting to hide one's involvement in a scheme after . . . it has been exposed in order to limit liability should not be confused with concealing the scheme itself in furtherance of its perpetration.  While the lat[t]er may be a predicate act within the meaning of RICO the former is not."  Phila. Reserve Supply Co. v. Nowalk & Assoc., Inc., No. CIV.A.91-0449, 1992 WL 210590, at *6 (E.D. Pa. Aug. 25, 1992).  As such, the mislabeling scheme must be deemed a separate pattern of racketeering from the cover-up scheme.

Further, even assuming *arguendo* that Plaintiff's allegations as to Designer Yarns's

---

[6] (See Compl. ¶ 113(g)(8) & (9).)

participation in the purported conspiracy to cover-up the initial fraud were adequate to allege a new

RICO conspiracy under § 1962(d),[7] Plaintiff cannot demonstrate that the cover-up was the

proximate cause of its monetary losses.  "For a plaintiff to have standing, he must demonstrate that a

defendant's predicate acts were the proximate cause of his injury."  See Holmes v. Sec. Investor

Prot. Corp., 503 U.S. 258, 268 (1992); see also Beck v. Pupris, 529 U.S. 494, 503 (2000) (holding

that a RICO conspiracy plaintiff must allege direct injury resulting from the predicate acts of the

enterprise.  In this case, none of the predicate acts to cover up the previous fraudulent activity

occurred until early July 2006.  (Compl. ¶¶ 60-61.)  Plaintiff, however, admits that its last purchase

of the yarns at issue occurred, at the latest, in the fall of 2005, that it pulled all of its stock of yarns

as of July 2006, and that it recalled the yarns by October 2006, thereby conceding that it was caused

no further injury as result of this cover-up.  (Id. ¶¶ 42, 45, 74-75.)  Moreover, the Complaint

expressly asserts that Plaintiff's business and commercial interests were harmed, not as a result of

the cover-up, but rather "[a]s a consequence of the false labeling of the three Cashmerinos yarns at

issue."  (Compl. ¶ 82.)  Indeed, when asked to explain the direct causal relationship between the

alleged injury and the violation of the RICO statute on its RICO Statement, Plaintiff stated only that,

"[h]ad the written representations [concerning the cashmere content of the yarns] made to Plaintiff

not been false, Plaintiff could have knowingly elected to not purchase the same products and not

have been injured by being required to remove from sale mis-labeled products, testing these and

other yarns identified by Mr. Elalouf as possibly mis-labeled, and effecting a recall of the six mis-

---

[7]  This assumption is made with a great deal of hesitation, as the Court simply cannot understand
how Designer Yarns's submission of balls of yarn for fiber analysis, after such yarn came under
scrutiny from the knitting community, demonstrates its intent to cover up any scheme.  To draw
from those facts the inference that Designer Yarns was attempting to cover up known
mislabeling, rather than simply inquiring and responding to detrimental rumors in the industry,
requires speculation not permitted by Rule 12(b)(6) jurisprudence.

labeled yarns inadvertently sold to consumers prior to the discovery of the same . . ." (RICO Statement 19-20.)  In short, Plaintiff fails to make any connection between its claimed injury and the purported cover-up.

In light of the foregoing, Plaintiff's RICO conspiracy claim against Defendant Designer Yarns cannot survive the Iqbal standard of review under Federal Rule of Civil Procedure 12(b)(6). As to the initial scheme to distribute mislabeled yarns, Plaintiff comes to this Court with little more than conclusions, based on belief only, that Designer Yarns was somehow controlled by Defendant Elalouf and in some way agreed to his plan to distribute yarns falsely labeled to contain cashmere. Even taking all of the well-pleaded facts as true, the Complaint indicates nothing more than a mere possibility of unlawful behavior by Designer Yarns, thus falling short of suggesting a plausible claim for relief.  Id.  As to the alleged cover-up, Plaintiff offers no factual allegations on which this Court could find that Designer Yarns knowingly agreed to participate in the pattern of racketeering activity, that this scheme was either part of the initial conspiracy, or that Plaintiff suffered any damages as a result of the cover-up.  On the whole, the cause of action against Designer Yarns simply fails to rise above a "[t]hreadbare recital" of the elements of a RICO conspiracy claim "supported by mere conclusory statements."  Iqbal, 129 S. Ct. at 1949.  Without more specific factual allegations to bolster the purported insidious relationship and "agreement" to commit the various frauds between the two Defendants, this Court cannot "unlock the doors of discovery" to Plaintiff to further pursue this claim against Designer Yarns.

## 2. **Filatura Pettinata**

Plaintiff's cause of action against Defendant Filatura Pettinata for a RICO conspiracy under § 1962(d) fares no better.  The Complaint puts forth the following allegations:

21

6.      Corporate Defendant FILATURA PETTINATA V.V.G. Di Stefano Vaccari & C. (S.A.S.), (hereinafter, referred to as 'Pettinata V.V.G.' or simply 'V.V.G.') is a closely held entity organized and/or existing under the laws of Italy with a principal place of business at 11 Via Gianasso, BENNA (BI) ITALIA 1387. Mr. Alberto Oliaro is the principal officer of V.V.G. A broker and fulfillment agent for privately labeled handknitting yarns, V.V.G. is believed to have brokered (identify and arrange for manufacture), but to not have manufactured itself, yarns for the KFI and Debbie Bliss brandnames – the three mis-labeled yarns at issue – although KFI represents V.V.G. to be the manufacturer. Despite ostensibly being an independent entity, Pettinata V.V.G. is believed to be, since 2006, dominated, if not as well controlled, by Sion Elalouf.

. . .

36.      . . . Plaintiff believes and avers that certainly before June 9, 2001 and on a date more specifically known only to Defendants, Mr. Elalouf and Designer Yarns entered into an agreement to substitute the 0% cashmere version for the Cashmerino spun of 12% cashmere. Thereafter,

    a. )      Alberto Oliaro, Pettinata V.V.G.'s principal officer was directed to manufacture the 0% cashmere yarn – through a spinner, more specifically known only to the Defendants – but label the finished product as spun of 12% cashmere;

    b. )      by processes and at a time more specifically uniquely within the Defendants' purview, but certainly by June 9, 2001, the zero-cashmere version of the Cashmerino was included in the new line of Debbie Bliss yarns to be launched by Designer Yarns;

    c. )      the zero cashmere version of the Cashmerinos was subsequently imported to the US for wholesale distribution by KFI under the Debbie Bliss brand from Designer Yarns and the K.F.I. brand – when Mr. Elalouf knew, or should have known, the Cashmerino version actually manufactured was spun of a 0% [zero percent] cashmere.

. . .

62.      Mr. Elalouf and Designer Yarns obtained Pettinata V.V.G.'s participation in the scheme alleged in ¶¶ 36 and 60 whereby V.V.G.:

    a. )      certainly by June 20, 2006, caused to be produced in Italy – specifically for testing purposes and spun with cashmere – three small wraps of a semi-finished yarn which V.V.G. sent to Designer Yarns in Keighley, England – knowing the small wraps would be subjected to fiber analysis and the resulting report of which would be disseminated by Mr. Elalouf and Designer Yarns for reliance by others to support the Elalouf-Designer claim the Cashmerinos have always been spun of cashmere;

b. )    caused to be produced, in Italy – specifically for testing purposes – and certainly by July 7, 2006, small quantities of a fully finished yarn of an indeterminate cashmere content which V.V.G. sent to Designer Yarns at its place of business in Keighley, England – knowing that such small quantities would be subjected to expert fiber analysis and knowing the report of which would be disseminated by Mr. Elalouf and Designer Yarns for reliance by others to support the Elalouf-Designer claim the Cashmerinos are and have always been are spun of the requisite quantity of cashmere;

c. )    provided Mr. Elalouf – at or after the international yarn trade show in Florence, Italy July 5 -7, 2006 – copies of two fiber analysis reports which Mr. Elalouf on July 11 published to others for their reliance as supporting the claimed cashmere content of the Cashmerinos. . . . One such report, issued by Laboratoria Accreditato 0331, would later be repudiated as the work-product of the testing company holding accreditation No. 0331. . . .

. . .

127.    Filatura Pettinata V.V.G., on or before June 20, 2006, in reckless disregard of the truth, knowingly joined the conspiracy as alleged in ¶ 60 to facilitate the cover-up of the Elalouf-Designer decision to palm off the 0% cashmere version for the Cashmerino spun of 12% cashmere, as alleged in ¶ 36, by:

a. )    prior to but certainly by June 20, 2006, providing Designer Yarns three small wraps of yarn for fiber analysis subsequently performed by Julie Smith;

b. )    shipping more than two weeks later and prior to July 7, 2006, sample balls of Cashmerino Aran which Designer Yarns presented for expert fiber analysis performed by Mary Lunn;

c. )    more than five weeks after Miss Smith made known her requirement that she randomly select finished yarns for definitive fiber analysis purposes, shipping to Designer Yarns quantities of finished yarn spun with cashmere for Miss Smith's sampling on July 27;

d. )    on or about July 7 and certainly by July 11, providing Mr. Elalouf:

( A. )    a report of fiber analysis dated January 09, 2006 performed by Primo Brachi for an entity known as Marcopolo, SRL in Genoa, Italy on yarn composed of 55% cashmere and 45% wool represented to be a fiber analysis of Cashmerino Aran, which report certainly is not an analysis of Cashmerino Aran (purportedly spun of 55% wool, 33% microfiber and 12% cashmere) – knowing Mr. Elalouf would present the Brachi report to other interested parties for their reliance as to the

23

cashmere content of the Cashmerino Aran product. . . .

( B. )    an undated report of fiber analysis, titled Rapporto di Prova
No. 050583 patently performed by Laboratorio Accreditato
No. 0331 on intermediate spun fiber (not fully and finally
manufactured as yarn) composed of 18.6 micron wool and
15.5 micron cashmere – representing the fiber analysis to be,
and knowing Mr. Elalouf would in turn represent to others for
their reliance, an analysis of the fiber content of the
Cashmerinos when, as stated by Mr. Elalouf, the Cashmerino
yarns are spun with Iranian cashmere of a more inferior quality
of 18-19 microns,

e.)    on August 23, 2006, providing a second time the undated Rapporto di
Prova No. 050583 represented as having been issued by Laboratorio
Accreditato No. 0331 – when Pettinata V.V.G. knew, or should have
known Laboratorio Accreditato No. 0331 identifies G.R. Biochenilab
SaS si Albano Rosa & C. which was first accredited as lab No. 0331
on May 15, 2001 before the manufacture of the Cashmerino products
and which lab repudiates the Rapporto di Prova No. 050583 as its
work product. . . .

(Compl. ¶¶ 6, 36, 62, 63, 127.)

Notably, footnote one of the Complaint explicitly clarifies that:

Plaintiff specifically alleges that *only V.V.G.'s post May 1, 2006 participation in the
cashmere caper renders V.V.G. liable for Plaintiff's injury* despite V.V.G. knowing
since 2001 that the Cashmerinos were not spun with the requisite quantity of
cashmere. Upon information and belief, in 2001 V.V.G. fulfilled its duty, owed to
Designer Yarns and Mr. Elalouf alone, to inform them of the actual cashmere content
of the Cashmerino. After May 26, 2006 V.V.G. joined the Elalouf-Designer
cashmere scheme to cover up of the absence of cashmere and facilitated the Elalouf-
Designer claim the Cashmerinos always contained the requisite quantity of cashmere.

(Id. ¶ 62 n.1 (emphasis added).)  Additionally, the RICO Statement asserts that Filatura violated §

1962(d) only by "[p]articipating in and facilitating a conspiracy to cover up the wholesale

distribution of handknitting yarns priced as spun with premium specialty fibers, such as cashmere."

(RICO Statement 2-3.)

Taking these various allegations and statements in conjunction, the lone basis for Plaintiff's alleged RICO conspiracy claim against Defendant Filatura stems from the purported scheme to cover up the mislabeling of the yarns.  As explained in extensive detail above, however, nothing in the Complaint allows the Court to make any reasonable inference that the cover-up scheme was part of the original RICO conspiracy to distribute mislabeled yarns.  "[T]he complaint does not allege that, upon learning about this scheme, [Filatura Pettinata] joined an existing conspiracy, but instead alleges that [it] joined the scheme by *forming* a conspiracy to cover it up from the public and the victims of the scheme."  Lopez v. Council on Am.-Islamic Relations Action Network, Inc., 657 F. Supp. 2d 104, 113 (D.D.C. 2009), aff'd, 383 Fed. Appx. 1 (D.C. Cir. 2010).  As a result, the predicate acts of Defendant Elalouf in furtherance of his original plan to supply mislabeled yarns cannot be attributed to Filatura Pettinata through a conspiracy theory.  In turn, assuming *arguendo* that the Complaint's allegations were sufficient to show Filatura's participation in a conspiracy to advance Elalouf's previous scheme by staging a cover-up,[8] Plaintiff still could not establish that such a cover-up caused its losses – thereby eliminating the required causation element for a § 1962(d) violation.  Given such findings the Court must also dismiss the RICO conspiracy claim as against Defendant Filatura.

### B.    Breach of the Implied Warranty of Merchantability

Plaintiff next lodges a claim against Defendant Filatura for breach of the implied warranty of merchantability, under 13 Pa.C.S. § 2314 based on the allegedly false labeling of the three

---

[8]  Defendant argues that such allegations are patently insufficient to properly allege Filatura's participation in a conspiracy.  It claims that Filatura's knowledge cannot be inferred simply from the fact that it produced yarn samples and reports to other alleged conspirators.  The Court is inclined to agree that such conduct, without more, does not support either the agreement or knowledge components of a § 1962(d) conspiracy, and amounts only to the "mere possibility" of wrongdoing.

Cashmerino Yarns distributed by Filatura.  (Compl. ¶¶ 92-98.)  Filatura now seeks dismissal of that claim on timeliness grounds.

Pennsylvania law holds that "[u]nless excluded or modified . . . a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . ."  13 PA. CONS. STAT. § 2314(a) (1984).  Goods are "merchantable" only when they, *inter alia*,  "pass without objection in the trade under the contract description," "are fit for the ordinary purposes for which such goods are used," and "are adequately contained, packaged, and labeled as the agreement may require."  Id. § 2314(b); see also Visual Commc'ns, Inc. v. Konica Minolta Bus. Solutions U.S.A., Inc., 611 F. Supp. 2d 465, 469 (E.D. Pa. 2009).

The statute of limitations for a breach of warranty is four years.  13 PA. CONS. STAT. § 2725(a).  It begins to run at the time of the tender or sale of the allegedly defective product, "regardless of the aggrieved party's lack of knowledge of the breach."  Id. § 2725(b); see also McCracken v. Daimler Chrysler Motors Co. LLC, No. CIV.A.07-2202, 2008 WL 920344, at *4 (E.D. Pa. Apr. 3, 2008) ("[A] breach of warranty action accrues on, and suit must be filed within four years of, the date the seller tenders delivery of the goods, even if the breach is not apparent until after delivery has been tendered.") (quoting Nationwide Ins. Co. v. Gen. Motors Corp., 625 A.2d 1172 (Pa. 1992)).

Although the Federal Rules of Civil Procedure indicate that a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion, "an exception is made where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading."  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994).   This so-called "Third Circuit Rule" explains that where the face of the

26

pleadings does not unequivocally reveal whether a cause of action has been commenced within the

limitations period, the Court may not dismiss the claim on a Rule 12 motion.  Robinson v. Johnson,

313 F.3d 128, 135 (3d Cir. 2002); see also Jaramillo v. Experian Info. Solutions, Inc., 155 F. Supp.

2d 356, 358-59 (E.D. Pa. 2001) (holding that for a Rule 12 dismissal of a claim as time-barred,

noncompliance with limitations period must clearly appear on the face of the pleading).

       Defendant Filatura now argues that it is evident from the face of Plaintiff's Complaint that

the claim for breach of implied warranty is time-barred.  Attached to Plaintiff's Complaint as

Exhibit 6 is a list of specific transactions between Plaintiff and KFI for the sale of the knitting yarns

at issue.  According to this document, the last sale of the subject yarns occurred on July 29, 2004.

Because the Complaint in this case was not filed until September 2, 2008 – more than four years

later – that cause of action, according to Defendant, is time-barred.  Plaintiff responds, however, that

the Motion to Dismiss this claim is meritless because (1) it references matters outside the Complaint

and (2) it wholly fails to credit KFI's documented acknowledgment that KFI shipped Cashmerino

yarns to Plaintiff in 2005.  (Pl.'s Resp. Filatura's Mot. to Dismiss 9.)

       The Court notes – and both parties recognize – that other Defendants in this case have, on

previous occasions, sought to dismiss the breach of implied warranty claim on statute of limitations

grounds.  In those previous instances, this Court acknowledged the evidentiary discrepancy between

the exhibit attached to Plaintiff's Complaint showing the last shipment of the yarn at issue to be July

29, 2004, and the affidavit from Plaintiff's principal indicating that The Knit With received

Cashmerino yarns from KFI in 2005.  Moreover, the Court has remarked that the Complaint itself

alleges only that Plaintiff purchased yarn from KFI between August 2001 and August 2005.

(Compl. ¶ 41.)  Under the plain import of the Third Circuit rule, the untimeliness of the breach of

implied warranty of merchantability claim is simply not apparent from the face of the Complaint.

27

As such, it is not the proper subject of a Rule 12(b)(6) motion.[9]

## IV.    CONCLUSION

In short, the Court concludes that the present Motions should be granted in part and denied in part.  First, Plaintiff has failed to properly plead a RICO conspiracy claim under 18 U.S.C. § 1962(d) against either Defendant Designer Yarns or Defendant Filatura.  To the extent Plaintiff alleges that Designer Yarns conspired with Defendant Sion Elalouf to distribute mislabeled yarns into commerce, the Complaint is devoid of factual allegations from which the Court can find a plausible claim for relief.  To the extent Plaintiff contends that both Designer Yarns and Filatura conspired with other Defendants to cover up the previous criminal action, the Court notes that such a cover-up is neither part of the original pattern of racketeering nor the proximate cause of Plaintiff's injuries.[10]  Second, the Court holds that, at this juncture, Plaintiff has adequately alleged that Defendant Filatura's breach of the implied warranty of merchantability occurred within the requisite statute of limitations, such that dismissal on a Rule 12(b) Motion is improper.

An appropriate order follows.

---

[9]  The Court remains cognizant that the parties are currently briefing summary judgment motions that address this issue.  At that time, and with a record of admissible evidence, the Court will decide the timeliness question.  At the current juncture, however, the Court will neither rule on this issue or grant Filatura's request to limit the scope of the breach of implied warranty claim.

[10]  Plaintiff makes a cursory request to amend its Complaint in the event the RICO claims are dismissed.  As this action has been pending for over two years and as Plaintiff has proceeded with significant discovery against some of the other Defendants, Plaintiff has had more than adequate opportunity to assess the quality of its RICO pleading against the non-U.S. Defendants.  Any further delay caused by allowing an amendment will unduly prejudice both the Defendants and this Court.  Accordingly, leave to amend is denied.