# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE KNIT WITH, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KNITTING FEVER, INC., | : | |
| DESIGNER YARNS, LTD., | : | |
| FILATURA PETTINATA V.V.G. DI | : | |
| STEFANO VACCARI & C., SION | : | NO.  08-4221 |
| ELALOUF, DIANE ELALOUF, JEFFREY | : | |
| J. DENECKE, JR., JAY OPPERMAN, and | : | |
| DEBBIE BLISS, | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| THE KNIT WITH, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EISAKU NORO & CO., LTD., | : | |
| KNITTING FEVER, INC., | : | |
| SION ELALOUF, DIANE ELALOUF, | : | NO.  08-4775 |
| and JAY OPPERMAN, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

BUCKWALTER, S.J.                                                    March 29, 2011


Currently pending before the Court are Motions to Dismiss filed by Defendants Diane

Elalouf, Jay Opperman, and Jeffrey J. Denecke, Jr. (collectively "Moving Defendants").  For the

reasons which follow, Diane Elalouf's Motion is granted, Jeffrey Denecke's Motion is granted, and

Jay Opperman's Motion is denied.

## I.     FACTUAL AND PROCEDURAL HISTORY

The factual background of this case is one familiar to both the parties and the Court and has been reiterated in several of this Court's prior opinions.[1] This matter arises between Plaintiff, The Knit With ("The Knit"), a small, family-owned and operated business retailing specialty yarns and accessories to consumers, Defendant Knitting Fever, Inc. ("KFI"), a New York corporation that imports and distributes specialty yarns, KFI's officers and directors, and Defendants Filatura Pettinata V.V.G. Di Stefano Vaccari & C. ("Filatura"), Debbie Bliss, and Designer Yarns, Inc. ("Designer Yarns"), all of whom are non-U.S. entities that design, manufacture, and/or distribute speciality yarns. At the core of the dispute is Plaintiff's claim that KFI sold designer knitting yarns to The Knit, representing that the yarns contained a percentage of cashmere, which they allegedly did not.

Following extensive motion practice by both parties, the Court has dismissed multiple claims and Defendants. The sole claims remaining in this action are: (1) breach of the express warranty of merchantability against Defendants KFI, Sion Elalouf, and Jay Opperman; (2) breach of the implied warranty of merchantability against Defendants KFI, Filatura, Sion Elalouf, and Jay Opperman; (3) injury to business and property pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962 against Defendant Sion Elalouf; (4) conspiracy to cause injury to business and property pursuant to RICO, 18 U.S.C. §1962(d) against Defendants Sion Elalouf, Diane Elalouf, Jeffrey J. Denecke, Jr., and Jay Opperman; and (5) a piercing the corporate veil allegation against Defendants KFI, Sion Elalouf, and Diane Elalouf. In addition,

---

[1] See The Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2008 WL 5381349, at *1-6 (E.D. Pa. Dec. 18, 2008); The Knit With v. Eisaku Noro, No. CIV.A.08-4775, 2008 WL 5273582, at *1-3 (E.D. Pa. Dec. 18, 2008); The Knit With v. Knitting Fever, Inc., Nos. CIV.A.08-4221, 08-4775, 2011 WL 891871, at *1-2 (E.D. Pa. Mar. 10, 2011).

Defendants Knitting Fever, Inc., Sion Elalouf, Diane Elalouf, Jeffrey J. Denecke, Jr., and Jay

Opperman (collectively "the KFI Defendants") have Counterclaims for defamation, tortious

interference with existing and prospective contracts, and trade libel.

On January 24, 2011, the Moving Defendants each filed a Motion for Judgment on the

Pleadings pursuant to Federal Rule of Civil Procedure 12(c), claiming that the Complaint fails to

adequately state a RICO conspiracy claim against them. Plaintiff filed separate Responses to each

Motion on February 22, 2011.[2]

## II.      STANDARD OF REVIEW

Under Rule 12(c) of the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed -

but early enough not to delay trial – a party may move for judgment on the pleadings." FED. R. CIV.

P. 12(c). The moving party bears the burden of demonstrating that the plaintiff has not stated a

claim upon which relief can be granted. Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).[3]

In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized

that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more

than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not

do." Id. at 555. It emphasized that it would not require a "heightened fact pleading of specifics,"

but only "enough facts to state a claim to relief that is plausible on its face." Id. at 570.

---

[2] Moving Defendants filed a consolidated Reply brief on March 3, 2011. Upon receipt of a letter from Plaintiff's counsel suggesting that Defendants had failed to comply with this Court's previous ruling that the parties must seek leave before filing reply or sur-reply briefs, the Court struck the brief. As later pointed out by counsel for Moving Defendants, this ruling was in error, as they had actually sought and received this Court's approval. Nonetheless, the Court deems the brief unnecessary to a proper ruling on the Motions for Judgment on the Pleadings.

[3] Although most of the cases cited in this standard of review deal with Fed. R. Civ. P. 12(b)(6), the difference between Rules 12(b)(6) and 12(c) is purely procedural and there is "no material difference in the applicable legal standards." Spruill v. Gillis, 372 F.3d 218, 223 n.2 (3d Cir. 2004).

Following the basic precepts of Twombly, the Supreme Court, in the subsequent case of

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), enunciated two fundamental principles applicable to a

court's review of a motion to dismiss for failure to state a claim.  First, it noted that "the tenet that a

court must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice."  Id. at 1949.  Thus, although "[Federal] Rule [of Civil Procedure] 8

marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior

era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than

conclusions."  Id.  at 1950.  Second, the Supreme Court emphasized that "only a complaint that

states a plausible claim for relief survives a motion to dismiss."  Id.  "Determining whether a

complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense."  Id.  The Supreme Court

explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for
> more than a sheer possibility that a defendant has acted unlawfully.  Where a
> complaint pleads facts that are "merely consistent with" a defendant's liability, it
> "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

Id. at 1949 (citing Twombly, 550 U.S. at 556-57).

Expanding on the Twombly/Iqbal standards, the United States Court of Appeals for the

Third Circuit succinctly summarized the two-prong analysis to be undertaken by district courts

during a Rule 12(b)(6) review:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim,
> district courts should conduct a two-part analysis.  First, the factual and legal
> elements of a claim should be separated.  The district court must accept all of the
> complaint's well-pleaded facts as true, but may disregard any legal conclusions.
> Second, a district court must then determine whether the facts alleged in the

complaint are sufficient to show that the plaintiff has a "plausible claim for relief."
In other words, a complaint must do more than allege the plaintiff's entitlement to
relief. A complaint has to show such an entitlement with its facts. As the Supreme
Court instructed in *Iqbal,* where the well-pleaded facts do not permit the court to
infer more than the mere possibility of misconduct, the complaint has alleged – but
it has not shown – that the pleader is entitled to relief. This plausibility requirement
will be a context-specific task that requires the reviewing court to draw on its judicial
experience and common sense.

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (internal citations omitted).

Notwithstanding the foregoing, nothing in Twombly, Iqbal, or Fowler altered some of the

fundamental underpinnings of the Rule 12(b)(6) standard of review. Arner v. PGT Trucking, Inc.,

No. CIV.A.09-565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); Spence v. Brownsville Area

Sch. Dist., No. CIV.A.08-626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008). Federal Rule of

Civil Procedure 8 still requires only a short and plain statement of the claim showing that the

pleader is entitled to relief and need not contain detailed factual allegations. FED. R. CIV. P. 8;

Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008). Further, the court must "accept all

factual allegations in the complaint as true and view them in the light most favorable to the

plaintiff." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006). Finally, the court

must "determine whether, under any reasonable reading of the complaint, the plaintiff may be

entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002); see also

Mayer v. Belichick, 605 F.3d 223, 229-30 (3d Cir. 2010).

## III.    DISCUSSION

The present Motions task the Court with determining the viability of Plaintiff's claim that

the Moving Defendants participated in an unlawful conspiracy pursuant to the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d). Specifically, Moving Defendants

contend that Plaintiff has failed to allege particularized factual allegations demonstrating that they

knowingly agreed either to participate in the alleged conspiracy or to the commission of any RICO predicate acts in furtherance of that conspiracy.

Under 18 U.S.C. § 1962(d), it is unlawful for any person to conspire to violate subsections (a), (b), or (c) of RICO. 18 U.S.C. § 1962(d). The essential elements of a § 1962(d) conspiracy include: (1) knowledge of the corrupt enterprise's activities and (2) agreement to facilitate those activities. Salinas v. United States, 522 U.S. 52, 66 (1997); Rose v. Bartle, 811 F.2d 331, 366 (3d Cir. 1989). Because there is no requirement of some overt or specific act, the RICO conspiracy provision is even more comprehensive than the general conspiracy offense. Salinas, 522 U.S. at 63. Thus, "a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise." Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001); see also Salinas, 522 U.S. at 64 ("If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."); Dongelewicz v. PNC Bank Nat'l Ass'n, 104 Fed. Appx. 811, 818 (3d Cir. 2004) (adopting Smith standard). "In certain circumstances, a defendant may be held liable under § 1962(d) even where its own actions would not amount to a substantive RICO violation." In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 372 (3d Cir. 2010). Nonetheless, "[u]nderlying a § 1962(d) claim is the requirement that plaintiff must show that defendants agreed to the commission of a 'pattern of racketeering.'" Breslin v. Brainard, No. CIV.A.01-7269, 2003 WL 22351297, at *13 (E.D. Pa. Oct. 14, 2003) (quoting Banks v. Wolk, 918 F.2d 418, 421 (3d Cir. 1990)), aff'd, 128 Fed. Appx. 237 (3d Cir. 2005). The Third Circuit has emphasized that those who innocently provide services will not incur § 1962(d) liability; rather "liability will only arise from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity." Smith, 247 F.3d at 538 n.11.

In light of these legal tenants, a RICO conspiracy complaint "must contain sufficient information for the court to determine whether or not a valid claim for relief has been stated and to enable the opposing side to prepare an adequate responsive pleading." 5 WRIGHT & MILLER, FED. PRAC. & PROC. CIV.3D § 1233 (3d ed. 2010). "Although mere inferences from the complaint are inadequate to establish the necessary factual basis . . . a court may look to any 'factual allegations of particular acts' within the complaint as a whole incorporated by the conspiracy claim to provide this basis." Rose, 871 F.2d at 336 (citations omitted). The elements which must be pled to allege a RICO conspiracy claim include: "(1) an agreement to commit the predicate acts of fraud, and (2) knowledge that those acts were part of a pattern of racketeering activity conducted in such a way as to violate § 1962(a), (b), or (c)." Odesser v. Cont'l Bank, 676 F. Supp. 1305, 1312 (3d Cir. 1987); see also In re Jamuna Real Estate, LLC, 416 B.R. 412, 428-29 (Bankr. E.D. Pa. 2009) (citing Rose, 871 F.2d at 366). Further, a conspiracy claim must contain statements addressing "the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1166 (3d Cir. 1989), abrogated on other grounds by Beck v. Prupris, 529 U.S. 494 (2000); see also Meeks-Owens v. Indymac Bank, F.S.B., 557 F. Supp. 2d 566, 573 (M.D. Pa. 2008) (noting that the above elements must be properly pled to set forth a § 1962(d) conspiracy). These required supportive factual allegations "must be sufficient to describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in that conspiracy." Rose, 871 F.2d at 366 (internal quotations and citations omitted).

To be clear, "allegations of conspiracy are not measured under the . . . [Fed. R. Civ. P.] 9(b) standard, which requires greater particularity of allegation of fraud, but are measured under the more liberal . . . [Fed. R. Civ. P. 8(a)] pleading standard." Odesser, 676 F. Supp. at 1313. Nevertheless,

7

it is not enough for a complaint to simply make "conclusory allegations of concerted action but [be] devoid of facts actually reflecting joint action." Abbott v. Latshaw, 164 F.3d 141, 148 (3d Cir. 1998); see also District 1199P Health & Welfare Plan v. Janssen, L.P., Nos. CIV.A.06-3044, 07-2224, 07-2608, 07-2860, 2008 WL 5413105, at *15-16 (D.N.J. Dec. 23, 2008). Moreover, "mere inferences from the complaint are inadequate to establish the necessary factual basis." Rose, 871 F.2d at 366. Rather, the "[p]laintiff must allege facts to show that each Defendant objectively manifested an agreement to participate, directly or indirectly, in the affairs of a RICO enterprise through the commission of two or more predicate acts." Smith v. Jones, Gregg, Creehan & Gerace, LLP, No. CIV.A.08-365, 2008 WL 5129916, at *7 (W.D. Pa. Dec. 5, 2008). "Bare allegations of conspiracy described in general terms may be dismissed." Id.

In the present case, Defendants Diane Elalouf, Jeffrey J. Denecke, Jr., and Jay Opperman[4] are all cited by Plaintiff as participants in an unlawful RICO conspiracy. In light of the fact-sensitive and individualized nature of this cause of action, the Court considers each Defendant separately.[5]

### A. Diane Elalouf

The Complaint against Defendant Diane Elalouf sets forth the following pertinent allegations:

---

[4] Opperman is also named in the breach of warranty claims, but he does not seek dismissal of such claims at this time.

[5] In response to all three Motions, Plaintiff argues that the Moving Defendants reference matters outside the pleadings. Plaintiff moves to either exclude the outside matters/evidence or, alternatively, convert the Rule 12(c) motions into motions for summary judgment. As this Court need not consider any evidence or matters outside the pleadings in order to decide the present Motions, Plaintiff's request is moot.

8. Defendant Diane Elalouf, is a citizen of New York and natural person residing at 22 Longwood Road, Sands Point, NY 11050-1260. At times material to this Complaint, Mrs. Elalouf is believed to be a KFI officer, director or shareholder, to have participated in and have been the beneficiary of KFI's corporate policies. Without being a 'Monday to Friday' KFI employee, Mrs. Elalouf is the sole person, other than her husband Sion, within KFI to have access to, and responsibility for scrutinizing, approving and paying invoices received from KFI's foreign suppliers, thereby facilitating her husband's cashmere caper and, further, is believed to have participated in KFI's perfidious dealing.

. . .

34. Pursuant to the plan described in ¶¶ 27-33, between July 5, 2000 and certainly by June 9, 2001, [Sion] Elalouf is believed to have discovered indistinguishable versions of a yarn called Cashmerino; the versions, one spun with a quantity of cashmere and the other with no cashmere at all, could constitute, to a merchant of a certain character, a remarkable find – especially so because:

    a. ) with Mr. Elalouf's extensive experience in the yarn trade, even he could not readily distinguish between the versions;

    b.) as Mr. Elalouf has since stated, without expert fiber analysis, it is virtually impossible to confirm the presence of cashmere in a spun yarn; and

    c. ) based upon Mr. Elalouf's 20 years of experience in commercial transactions with retail yarn shops, Mr. Elalouf knew the overwhelming majority of US retailers lack both access to and the resources to retain the professional expertise to determine the fiber content of finished yarns – or other professionals to seek redress in the event a yarn is discovered to be mis-labeled.

35. By processes more specifically unknown at present to Plaintiff and uniquely available only to the Defendants but certainly no later than October, 2001 and enduring through October, 2005, among the many persons working at or for KFI, only Sion and Diane Elalouf had access to documents concerning yarns imported and wholesaled by KFI; indeed, Diane Elalouf – without being a 'Monday to Friday' KFI employee – had sole responsibility to scrutinize, approve and pay manufacturers' and suppliers' invoices with sole access to attendant fiber content disclosures made by such manufacturers, whereby Mrs. Elalouf:

    a.) could prevent regular KFI employees from learning the invoiced purchase values of goods imported by and resold to yarn shops by KFI;

b) could prevent regular KFI employees from learning the true source of products imported by and resold to yarn shops by KFI; and

c) could prevent regular KFI employees learning, as disclosed by the manufacturer, the actual fiber content of goods imported and resold by KFI.

36. Consequent to the allegations of ¶ 34, Plaintiff believes and avers that certainly before June 9, 2001 and on a date more specifically known only to Defendants, Mr. Elalouf and Designer Yarns entered into an agreement to substitute the 0% cashmere version for the Cashmerino spun of 12% cashmere. Thereafter,

a.) Alberto Oliaro, Pettinata V.V.G's principal officer was directed to manufacture the 0% cashmere yarn – through a spinner, more specifically known only to the Defendants – but label the finished product as spun of 12% cashmere;

b.) by processes and at a time more specifically uniquely within the Defendants' purview, but certainly by June 9, 2001, the zero-cashmere version of the Cashmerino was included in the new line of Debbie Bliss yarns to be launched by Designer Yarns;

c.) the zero cashmere version of the Cashmerinos was subsequently imported to the US for wholesale distribution by KFI under the Debbie Bliss brand from Designer Yarns and the K.F.I brand – when Mr. Elalouf knew, or should have known, the Cashmerino version actually manufactured was spun of a 0% [zero percent] cashmere.

. . .

60. Upon information and belief – to effect 'damage control' and to continue 'pulling the wool' over the trade concerning the cashmere content of the Cashmerinos – Mr. Elalouf and Designer Yarns agreed, after May 26, 2006 and certainly before June 20, to claim the Cashmerinos, since 2001, *always* contained the requisite quantity of cashmere (or, conversely, to cover-up the absence of any cashmere content in the Debbie Bliss Cashmerino since 2001.

. . .

131. Certainly through November, 2005, Diane Elalouf, as the sole person working at K.F.I. (other than her husband Sion) with access to the manufacturer's stated fiber content of the Cashmerino yarns subject to the scheme alleged in ¶¶ 36 and 60, participated in and facilitated the success enjoyed by that scheme in keeping secret and preventing regular KFI employees from detecting the Cashmerino products at issue were spun of a 0% [zero percentage] of cashmere as disclosed to KFI by the manufacturer or seller of such yarns.

132. Plaintiff believes and avers the corporate defendants Designer Yarns, Ltd. and Filatura Pettinata V.V.G. and the individual defendants Diane Elalouf, Debbie Bliss, Jay Opperman and Jeffrey J. Denecke, Jr. conspired with Mr. Elalouf in the scheme alleged in ¶ 36 and the attempted cover-up, as alleged in ¶ 60 of the absence of cashmere in the Cashmerino yarns.

133. Plaintiff believes and avers the corporate defendants Designer Yarns, Ltd. and Filatura Pettinata V.V.G. and the individual defendants Diane Elalouf, Debbie Bliss, Jay Opperman and Jeffrey J. Denecke, Jr. participated in the attempt to cover-up, as alleged in ¶ 60, of the absence of cashmere in the Cashmerino yarns.[6]

(Compl. ¶¶ 8, 34-36, 60, 131-33.)  Plaintiff's December 23, 2009 RICO Case Statement ("RICO Statement") then clarifies that Defendant Diane Elalouf violated section 1962(d) by "[p]articipating in and facilitating a conspiracy to cover up the wholesale distribution of handknitting yarns priced as spun with premium specialty fibers, such as cashmere."  (RICO Statement ¶ 2.)

As set forth in detail in the Court's Memorandum and Order dated March 10, 2011, the Complaint effectively alleges two separate conspiracies:  (1) a conspiracy between the KFI Defendants and Designer Yarns to distribute mislabeled yarn – a scheme alleged to be carried out by the various predicate acts of Sion Elalouf; and (2) a conspiracy between the KFI Defendants and the remaining Defendants to cover up the initial fraudulent plans.  Knit With v. Knitting Fever, Inc., Nos. CIV.A.08-4221, 08-4775, 2011 WL 891871, at *8 (E.D. Pa. Mar. 10, 2011).[7]  To the extent Plaintiff alleges that Diane Elalouf participated in the latter conspiracy to cover-up the mislabeling

---

[6]  Paragraph 80 of the Complaint also alleges that Diane Elalouf's involvement in a matter known as the Coates litigation reflects her participation in the conspiracy.  Notably, however, the Court's opinion with respect to the KFI Defendants' original Motion to Dismiss held that there was no possible causal nexus between the Coates litigation acts and Plaintiff's injuries in this case and, as such, struck any allegations pertaining to that litigation.  Knit With v. Knitting Fever, Inc., No. CIV.A.08-4221, 2008 WL 5381349, at *22-23 (E.D. Pa. Dec. 18, 2008).

[7]  In lieu of repeating the extensive analysis of the RICO conspiracy claim set forth in that Opinion, the Court incorporates much of it by reference into this opinion.

of the yarns (Compl. ¶¶ 132-33), this Court's March 10, 2011 Memorandum fully addressed the fundamental legal problems underlying this theory. The Court explained that nothing in the Complaint allows for any reasonable inference that the cover-up scheme was part of the original RICO conspiracy to distribute mislabeled yarns. <u>Knit With</u>, 2011 WL 891871, at *10-11. Moreover, as discussed previously, assuming that Plaintiff's allegations regarding Diane Elalouf's participation in the purported conspiracy to cover-up the initial fraud were adequate to allege a new RICO conspiracy under § 1962(d),[8] Plaintiff cannot demonstrate that the cover-up was the proximate cause of its monetary losses. <u>Id.</u> at *11. Indeed, the Complaint expressly asserts that Plaintiff's business and commercial interests were harmed, not as a result of the cover-up, but rather "[a]s a consequence of the false labeling of the three Cashmerinos yarns at issue." (Compl. ¶ 82.) Given that Plaintiff claims no actual injury from the cover-up, Diane Elalouf cannot be held liable for participation in any such conspiracy.

To the extent Plaintiff asserts that Diane Elalouf played an active role in the initial scheme to distribute mislabeled yarns, the Complaint is clearly insufficient to state a claim upon which relief may be granted. According to the Complaint, Diane Elalouf was the sole person, other than her husband, with access to the manufacturer's stated content of the Cashmerino yarns at issue. (Compl. ¶¶ 35, 131.) It goes on to baldly state that she "participated in and facilitated the success enjoyed by that scheme in keeping secret and preventing regular KFI employees from detecting the Cashmerino products at issue were spun of a 0% [zero percentage] of cashmere as disclosed to KFI by the manufacturer or seller of such yarns." (<u>Id.</u> ¶ 131.) Noticeably missing from the allegations is

---

[8] The Court makes this assumption only for purposes of this Motion. In reality, the Complaint fails to set forth any allegations suggesting that Diane Elalouf either agreed to commit any predicate acts towards the cover-up or had knowledge that the cover-up was part of racketeering activity.

any indication that Diane Elalouf had any actual knowledge of the alleged corrupt enterprise's activities. Merely alleging that Mrs. Elalouf had access to the manufacturer's stated contents of the Cashmerino yarns and "could prevent" regular KFI employees from learning of the mislabeling, does not allow the Court to make the momentous leap to infer that she possessed actual knowledge as to either the fiber content of the yarns or the fact that the yarns were mislabeled. Moreover, the simple contention that she was a director, officer, and shareholder of KFI who benefitted from KFI's financial success does not permit the Court to find, as Plaintiff now argues, that she had "knowledge of KFI's trade policies and practices" which "in the ordinary course, she established or approved."[9] (Pl.'s Resp. Diane Elalouf's Mot. J. Pleadings 7); see First City Nat. Bank v. FDIC, 730 F. Supp. 501, 508-09 (E.D.N.Y. 1990) (knowledge cannot be imputed to directors of a corporation and recklessness is not sufficient to impose liability for RICO; "an unwitting participant in a RICO

_____

[9] Citing to the Third Circuit case of Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001), Plaintiff argues that Mrs. Elalouf did not need to have full knowledge of the total scope of and illegality of the conspiracy. It contends that "[f]ew 'bad actors' could successfully recruit conspirators to their schemes by revealing the details and implications of the conspiracy. Almost by definition, conspirators are lured to participate in illegal conduct precisely because the conspirators are unaware of the total scope of and the illegality of the conspiracy. Conversely, 'bad actors' ordinarily do not divulge the details of an entire scheme for fear either the potential conspirator would 'steal' the scheme or 'rat out' the bad actor." (Pl.'s Resp. Diane Elalouf's Mot. J. Pleadings 9.)
      As the Court found previously, however, the Berg case held only that "one who opts into or participates in a conspiracy is liable for the acts of his co-conspirators which violate section 1962(c) even if the defendant did not personally agree to do, or to conspire with respect to, *any* particular element." Id. at 537. In other words, it stated that a substantive violation of section 1962 is not a prerequisite to liability for conspiracy under § 1962(d). Id. Nothing in that case abrogated the well-established principle that liability under § 1962(d) is available only for services "which were *purposefully and knowingly* directed at facilitating a criminal pattern of racketeering activity." Id. at 537 n.11 (emphasis added). Indeed, the law is clear that a RICO violator must not only agree with his co-conspirator, but he must have also known at the time of the conspiracy that he would be engaging in racketeering. Rose, 871 F.2d at 367. As such, those who innocently provide services without knowledge that they are aiding a criminal pattern of racketeering will not incur liability. Berg, 247 F.3d at 537.

conspiracy enterprise is not within the ambit of the statute.").

Further, and perhaps more remarkably, nothing in the Complaint allows any reasonable inference that Diane Elalouf *agreed* to facilitate Sion Elalouf's commission of predicate acts in furtherance of the scheme by preventing other KFI employees from learning of the true nature of such yarns. As noted above, "[b]ecause the core of a RICO civil conspiracy is an agreement commit predicate acts, a RICO civil conspiracy complaint must allege specifically such an agreement." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990). Merely because Mrs. Elalouf was married to Sion Elalouf and had responsibility for approving and paying invoices from KFI's foreign suppliers as part of her employment does not, by any logical stretch, imply that she was voluntarily engaged in efforts, pursuant to an explicit agreement, to disguise an unlawful racketeering enterprise. United States v. Pearce, 912 F.3d 159, 162 (6th Cir. 1990) ("[M]ere association with conspirators is not enough to establish participation in a conspiracy." (quotations omitted)). Plaintiff simply fails to define specific facts demonstrating Mrs. Elalouf's agreement with Sion Elalouf to participate in the scheme to sell mislabeled yarn. While suggesting that Mrs. Elalouf may have had the ability to shield other KFI employees from true knowledge about the wool content of the yarns at issue, the Complaint does not indicate whether she actually did so, how such actions would further the conspiracy, and most importantly, whether any of her actions were done with the intention of hiding the underlying scheme devised by her and Sion Elalouf.

In short, the allegations against Diane Elalouf present nothing more than the "sheer possibility" that she has acted unlawfully, while stopping short of showing the plausibility of misconduct on her part.[10] Accordingly, the RICO conspiracy claim against her is dismissed.

_____

[10] The Court notes that Plaintiff maintains a piercing the corporate veil allegation against Diane Elalouf. If this claim is found to have merit, she will be liable for any wrongdoing by Defendant

14

**B.      Jeffrey J. Denecke, Jr.**

The allegations against Jeffrey J. Denecke, Jr. are as follows:

10.     Individual Defendant Jeffrey J. Denecke, Jr., a citizen of New York, is a
        natural person residing at 3884 Beechwood Place, Seaford, NY 11783-2025.
        At times material to this Complaint, and certainly since 2006, if not before,
        Mr. Denecke has been employed by KFI as Operations Manager and has been
        a key participant in and has facilitated KFI's racketeering activities
        subsequent to June 12, 2006 – activities which have injured Plaintiff's
        business.

. . .

67.     On July 20, Jeffrey Denecke Jr. joined the conspiracy alleged in ¶¶ 36 and 60
        by:

        a. )     corresponding, via US Mail to hundreds if not as many as 2,000
                 specialty yarn stores, providing "KFI's official response to the
                 Cascade mailing" of July 18;

        b. )     causing his letter and the attachments thereto to be disseminated by
                 wire to retail yarn shops for which KFI possessed e-mail addresses;

        c.)      causing his letter and the Elalouf attachment to be electronically
                 published by *Knitter's Review* in a public forum for the benefit of
                 handknitting consumers. . . .

68.     Attached to the Denecke correspondence disseminated to yarn shops by mail
        and wire were five documents:  a possibly prolix and positively polemic letter
        authored by Sion Elalouf studied to squelch shops abandoning the Debbie
        Bliss cashmerinos and the four fiber analyses identified in ¶ 61. . . .

69.     The Elalouf letter disseminated by Denecke:

        a. )     offered KFI's and Mr. Elalouf's assurances "that Debbie Bliss's
                 Cashmerino yarn contains cashmere", . . .

        b. )     questioned the reliability of fiber analyses performed by Ken Langley,
                 . . .

        c.)      questioned the cashmere content of as many as 25 cashmere yarns
                 distributed by KFI's competitors, . . .

---

KFI, which could include either breach of an express warranty or breach of the implied warranty
of merchantability.  In addition, Mrs. Elalouf has brought her own counterclaims against
Plaintiff.  As such, the Court cannot, at this time, dismiss her as a party to this action.

d. )    stated KFI was "anxious to furnish" retailers "whatever information you need to put your mind at ease", . . .; Plaintiff again requested KFI provide a Wool Products Guaranty of Compliance and KFI demurred – offering instead to furnish a general letter at some uncertain, future, point.

. . .

76.    On October 19, 2006, Mr. Denecke electronically published an open letter to ***Knitter's Review*** in which he branded the recall both a publicity stunt and a "smear campaign targeting KFI's products." . . .

. . .

128.    Certainly by July 20, 2006, defendant Jeffrey J. Denecke, Jr., in reckless disregard of the truth, agreed to join the conspiracy alleged in ¶ 60 by:

a. )    on July 20, 2006, causing to be placed in the US Mail correspondence of Sion Elalouf and attached reports of four fiber analyses crafted to squelch questioning of the fiber content of the Debbie Bliss Cashmerinos; . . .

b.)    also on July 20, 2006 using interstate wires to transmit the same correspondence to retail yarn shops and to publish the same at ***Knitter's Review*** . . .

c.)    preparing a form letter dated September 7, 2006 and thereafter transmitted to retail yarn shops representing, *inter alia*, "it is not possible for the spinning mill to forget to put the cashmere in the blend', [sic] "it is impossible to forget to include a specific fiber" and "the Debbie Bliss Cashmerino is everything it is meant to be. It is the same product our customers have enjoyed for the past five or six years." . . .

d.)    on October 19, 2006, using interstate wires to publish at ***Knitter's Review*** a general letter – ostensibly refuting the necessity of Plaintiff's consumer recall and claiming the recall to be a publicity stunt exacting revenge against KFI and its products. . . .

. . .

132.    Plaintiff believes and avers the corporate defendants Designer Yarns, Ltd. and Filatura Pettinata V.V.G. and the individual defendants Diane Elalouf, Debbie Bliss, Jay Opperman and Jeffrey J. Denecke, Jr. conspired with Mr. Elalouf in the scheme alleged in ¶ 36 and the attempted cover-up, as alleged in ¶ 60 of the absence of cashmere in the Cashmerino yarns.

133.    Plaintiff believes and avers the corporate defendants Designer Yarns, Ltd. and Filatura Pettinata V.V.G. and the individual defendants Diane Elalouf, Debbie Bliss, Jay Opperman and Jeffrey J. Denecke, Jr. participated in the

> attempt to cover-up, as alleged in ¶ 60, of the absence of cashmere in the Cashmerino yarns.

(Compl. ¶¶ 10, 67-69, 76, 128, 132-33.)  In addition, Plaintiff's RICO Statement charges Mr.

Denecke with "[p]articipating in and facilitating a conspiracy to cover up the wholesale distribution

of handknitting yarns priced as spun with premium specialty fibers, such as cashmere."  (RICO

Statement ¶ 2.)

Reading these various allegations in their entirety, Plaintiff's sole alleged basis for including

Defendant Denecke in the RICO conspiracy claim stems from the purported scheme to cover up the

mislabeling of the yarns.  The Complaint expressly concedes that "Mr. Denecke . . . has been a key

participant in and has facilitated KFI's racketeering activities *subsequent to June 12, 2006*" and that

"[o]n July 20, [2006],  Jeffrey Denecke Jr. joined the conspiracy."  (Compl. ¶¶ 10, 67 (emphasis

added).)  Again, however, nothing in the Complaint allows the Court to make any reasonable

inference that the cover-up scheme was part of the original RICO conspiracy to distribute

mislabeled yarns.  As a result, the predicate acts of Defendant Elalouf in furtherance of his original

plan to supply mislabeled yarns cannot be attributed to Jeffrey Denecke through a conspiracy theory.

In turn, Plaintiff fails to allege that the cover-up scheme caused its losses – thereby eliminating the

required causation element for a § 1962(d) violation.  Given such findings the Court must dismiss

the RICO conspiracy claim as against Defendant Denecke.

### C.   Jay Opperman

In the third and final motion presently before the Court, Defendant Jay Opperman seeks

dismissal of the RICO conspiracy claim against him.  With respect to this cause of action, the

Complaint makes the following allegations:

9.  Defendant Jay Opperman, is a citizen of New Jersey and natural person residing at 78 Clinton Avenue, Montclair, NJ, 07042-2116. At times material to this Complaint and as recently as 2002, Mr. Opperman has held himself out as an independent sales representative of KFI, and more recently as KFI sales manager responsi sales of handknitting yarn products to retailers such as The Knit With. Since 2001, Mr. Opperman is a director of, and one of but two currently registered owners of, the shares of Designer Yarns, Ltd. . . . At all times relevant to this Complaint, Mr. Opperman actively participated in and facilitated the wrongful conduct that is the subject of this Complaint, including but not limited to making and breaching express warranties as to the qualities and characteristics of falsely advertised yarns, conspiring to facilitate the cover-up of the cashmere caper and thereby causing injury to Plaintiff's business and commercial interests.

. . .

31. To implement the plan for a fully controlled 'designer' product, Sion Elalouf and Jay Opperman, with other persons not susceptible as defendants, created a company to hold the brandnames and distribution rights to 'designer yarns' – yarns to be branded with the names of recognized designers in the international handknitting yarn trade. On April 12, 2001, in England, a certificate of incorporation, as Company No. 4187433, was issued to Designer Yarns, Ltd. . . . Thereafter, Designer Yarns is believed to have entered into agreements whereby:

a.) KFI is the sole US importer-wholesaler of products manufactured for Designer Yarns; and

b.) Debbie Bliss would license her name to brand yarns marketed as Debbie Bliss yarns.

32. Apparently to avoid if not evade US Customs scrutiny of import transactions between related parties, Mr. Elalouf is not disclosed as a shareholder, director or participant in Designer Yarns, Ltd. Mr. Elalouf maintains access to Designer Yarns by way of Mr. Oppermans' equity and directorship roles – as apparently agreed to by Mr. Opperman, KFI's national sales manager. . . .

. . .

37. Even before formal release of the Cashmerino yarns at the June 9-11, 2001 US trade show for the yarn trade, Jay Opperman – as an independent sales representative for KFI – introduced Plaintiff to a new product, K.F.I. Cashmerenos DK, described as and purported to be a premium, handknitting yarn created exclusively for KFI and represented to be spun of 55% merino wool, 33% microfiber and 12% cashmere. Upon the representations made, Plaintiff purchased the Cashmerenos DK for resale and in the course of time added 45.5 kilos of the product to its inventory.

. . .

72. To solidify the Elalouf-Designer claim the Cashmerinos *always* contained the

requisite quantity of cashmere, on or about September 26 [2006], KFI caused to be distributed by the United States Mail to specialty yarn retailers an open letter ostensibly authored by Debbie Bliss expressing:

a.) her sadness and distress from rumors the Cashmerinos are spun with no cashmere; and

b.) her 'complete confidence' the yarns are spun with the labeled cashmere content. . . .

73. Upon Plaintiff's information, in October, 2006, on a date more specifically known to Defendant alone, Jay Opperman traveled to retailers in New York with the message there is cashmere in the Cashmerinos as indicated by the KFI-issued test reports; remarkably Mr. Opperman claimed the presence of cashmere in the yarns was substantiated by the absence of any lawsuits being filed against KFI.

. . .

130. Beginning in July, 2006 and extending for months thereafter, at dates and times more particularly known to Defendant alone, Jay Opperman agreed to join the scheme alleged in ¶¶ 36 and 60 by:

a.) as a director of Designer Yarns, authorizing or acquiescing in the issuance of the fiber analyses identified in ¶¶ 65-66 – which actions Mr. Opperman knew or should have known were contrary to the UK Trade Regulation Act of 1968,

b.) as a KFI sales representative, causing to be distributed, for the recipient's reliance, copies of the reports identified in ¶¶ 65-66 to multiple individual retail yarn shops, including shops located in Rochester and Valley Stream, NY;

c.) representing to yarn shops located in Rochester and Valley Stream, NY that Plaintiff's recall of the Cashmerino products was wholly unsubstantiated as indicated by the absence of any lawsuit filed against KFI.

(Compl. ¶¶ 9, 31, 32, 37, 72, 73, 130.)

As to Mr. Opperman's post-2006 activities in furtherance of an alleged cover-up scheme, Plaintiff's Complaint suffers a fate similar to that of the same claim against the other Defendants. Because the cover-up is not sufficiently alleged to be part and parcel of the original mislabeling scheme, and because Plaintiff has alleged no injury from the cover-up, the RICO conspiracy claim

against Opperman on these grounds must be dismissed.

Nevertheless, the RICO conspiracy claim against Opperman with respect to the purported scheme to distribute mislabeled yarns gives this Court more pause. Unlike with some of the previous Defendants, the Complaint defines a business relationship – centered upon the distribution of knitting yarns – between Opperman and Sion Elalouf. It explicitly suggests that the two men affirmatively agreed to enter into a joint business venture, which involved the sale of the precise knitting yarns at issue. Thereafter, the Complaint states that Opperman undertook to sell the yarns on behalf of KFI, at which point he affirmatively – and supposedly falsely – represented that they contained 55% merino wool, 33% microfiber, and 12% cashmere. Finally, the Complaint infers that by virtue of his position both as a sales representative for KFI and an officer of Designer Yarns, which held the brandnames for the yarns at issue, Mr. Opperman had actual knowledge of Mr. Elalouf's plan to distribute such mislabeled yarns.

Reading the allegations against Opperman within the context of the Complaint as a whole, the Court is constrained to find that they provide sufficient facts upon which to infer both knowledge of a racketeering enterprise and an agreement to facilitate the scheme to defraud. Without question, Plaintiff fails to connect many of the dots as to the extent and basis of Opperman's knowledge, leaving the claim teetering on the narrow fence between "possibility of liability" and "plausibility of liability." Nonetheless, given the burdens at this stage of the litigation and taking all of the allegations of the Complaint as true, Plaintiff sets forth enough of a factual context upon which a reasonable inference can be drawn that Opperman was not ignorant of the properties of the products he actively sold to yarn retailers. Furthermore, it is sufficiently plausible that Opperman used such sales tactics in an effort to further the agreement with Mr. Elalouf to profit

from the distribution of mislabeled yarns.  More simply put, the Court holds that the Complaint

survives – albeit barely – to implicate Opperman in a RICO conspiracy.

**IV.      CONCLUSION**

In sum, the Court again finds that the Complaint fails to adequately plead a RICO conspiracy

claim against some of the named Defendants.  As to Diane Elalouf, the Complaint is simply devoid

of facts upon which the Court can infer either knowledge or agreement to participate in any

purported scheme to distribute yarns.  As to Jeffrey Denecke, the Complaint alleges only his

participation in the cover-up of the mislabeling scheme, which, as explained in this Court's previous

opinion, is an insufficient basis upon which Plaintiff may rest its claim for a RICO conspiracy.

With respect to Jay Opperman, however, the Complaint manages to put forth enough factual

allegations to push it past the pleading stage and allow it to be tested by the rigors of discovery.

An appropriate Order follows.