# JAMES FRANCIS CASALE, ESQUIRE

Counselor at Law

21 November, 2012

The Honorable Ronald L. Buckwalter, Senior Judge
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
14614 United States Courthouse
601 Market Street                                      VIA E-MAIL
PHILADELPHIA, PA   19106

Re:   *The Knit With v. Knitting Fever, Inc., et al.* – U.S.D.C. E.D. PA No. 02: 2008-cv-04221
      <u>Leave to Motion for Relief</u>

Dear Judge Buckwalter,

Attached is correspondence from Joanna J. Cline, counsel for Counterclaimant Knitting Fever, Inc. received this date and apparently directed to postpone, if not evade, the scheduled trial of KFI's counterclaims. *See*, Exhibit "1". Other issues aside, considering the late and surprise identification of 78 CCMI documents, The Knit With is prejudiced by KFI's surprise gambit. The KFI tactic necessitates the instant request for leave to motion for relief from the close of discovery.

Presumptively, KFI intends to support motions in limine with the newly identified 78 CCMI documents to be filed 5 December. The KFI motions will seek to misuse the CCMI documents to deprive The Knit With of the defense of truth to the KFI defamation and tortious interference counterclaims.

Contrary to Ms. Cline's statement, the 78 documents ( identified as CASKDL000527-CASKDL000604 ) are not attached to her correspondence – effecting a calculated delay in ascertaining KFI's actual purpose. This is contrary to the defense counsel's prior practice of electronically transmitting documents larger than 78 pages as well as, in some instances, effecting a CD production.

Unclear is how Ms. Cline could, however incorrectly, expect the identified 78 documents were previously received in this action. The 78 documents were neither requested nor produced in discovery. Discovery closed more than one year ago. Had the 78 documents been produced in discovery, Ms. Cline would hardly have to be cautious in identifying the 78 pages now – two weeks before motions in limine may be filed.

The identified 78 pages apparently originate with a KFI subpoena served in the District of Massachusetts against a third party, CCMI, ostensibly in aid of the Washington proceeding to which KFI, among others, is a defendant. *See*, Exhibit "2". Contrary to Ms. Cline's reference, the identified 78 pages are not publicly available from the Washington court. Of the approximately 200 pages comprising Document 739 entered on that court's civil Docket No. 10-0861, only 28 pages, or 35%, of the 78 documents now identified by Ms. Cline are available for review. Stated another way, almost two-thirds of the 78 pages ( 65% ) remain excluded from review by KFI's calculated method of untimely and recent notice.

**LAW OFFICE OF JAMES F. CASALE**
8226 Germantown Avenue ▪ Chestnut Hill, PA 19118 - 3402 ▪ 215 - 247 - 4726
JFCasaleEsq@msn.com

Moreover, further review of the Washington docket raises multiple questions about the CCMI documents. Apparently, CCMI does not share KFI's view that CCMI-sponsored academic studies of fiber analysts. *See*, Exhibit "3". Importantly, CCMI can not identify any CCMI study which demonstrates fiber analysis is both subjective and inaccurate. Instead, CCMI suspects KFI ( and, perhaps, its counsel too ) misreads the CCMI study which KFI fails to sufficiently identify. Similarly, the relevancy of the academic CCMI studies of pure animal blends to the determination of a commercial blend's fiber content is obscure if not suspect. *See*, Exhibit "4".

The publicly available 27 documents indicate the CCMI tests – whatever their purpose, however the blends are constructed or however the results are interpreted  – lack even marginal probative value to the fiber analysis of commercial blends which do not include yak fibers. *Id*. Or the angora, mohair, native sheep and Optim wool seasoning the CCMI test samples. Importantly, half of the CCMI test samples KFI cautiously identifies have a disclosed content of angora, mohair, native sheep wool, Optim wool or yak and none of the CCMI samples blend animal and manufactured or artificial fibers such as the KFI yarns at issue. Simply put, the CCMI academic samples are wholly unlike the commercial blend at issue. It is unlikely the Court will be persuaded by KFI's new demonstration that apples are identical to oranges.

Moreover, the academic CCMI studies apparently wholly rely upon microscopical analysis or unidentified methods to determine fiber types. *Id*. The 27 available CCMI documents do not disclose the use of objective chemical analyses to differentiate the proportion of manufactured or artificial fibers from animal fibers such as the analyses relied upon by The Knit With. Simply put, KFI seeks to mislead the factfinder with unsupported claims of inaccuracy, subjectivity, confirmation bias and unreliability.

Then too, CCMI's academic studies apparently include the use of typical and atypical animal fibers as well as fibers which have been modified physically and or chemically or otherwise artificially treated. *See*, Exhibit "5". Results of academic studies constructed of atypical, or modified or treated fibers can only be intended to confuse the jury in its determination of the accuracy of KFI's statements concerning the composition of commercial blends

Finally, in addition to the above substantive questions, KFI lacks a sufficient procedural basis for its expected use of the technical information presented in the 28 CCMI documents. As CCMI suspects KFI ( and, perhaps its counsel too ) misreads the results of the unidentified CCMI 2007 test, the Court lacks the necessary assurances that KFI's counsel can adequately explain the CCMI documents without resulting in a ruling rife with error.

In sum, KFI's identification two weeks before motions in limine are due of 78 pages of previously non-produced documents raises questions of basic fairness and undue surprise.

In light of the approaching deadline for motions in limine and the nearness of the scheduled trial, Counterclaim Defendant is constrained to request leave to motion for the emergency relief of a limited re-opening of discovery.

The requested necessary discovery would be directed to resolving the numerous questions of technical fact inherent to the 28 documents identified just today by KFI. The requested discovery would be limited to the

testimony of an appropriate CCMI representative concerning the now identified 28 pages of CCMI academic studies and such other witnesses as may be required following review of the remaining 61 documents for which KFI's calculated tactic in postponing production prevents timely review.   The requested motion will also request such other relief as the Court, in its discretion, may reasonably require.

Undersigned counsel is well aware that KFI has maneuvered yet another delay in a trial scheduled to commence 14 January and originally scheduled to occur more than three (3) years ago.

 Thank you for your attention to this matter.


                                       Very truly yours,



JFC/                                   JAMES F. CASALE, Esquire




**COPIES TO :**      Dean Browning Webb, Esquire  **VIA E-MAIL**
                     Joanna J. Cline  **VIA E-MAIL**
                     Noah S. Robbins  **VIA E-MAIL**

# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **The Knit With**, *a Pennsylvania Partnership*, | : |
| *Plaintiff*, | : |
| *vs.* | : |
| **Knitting Fever, Inc**., *a New York corporation*, | : |
| **Designer Yarns, Ltd.**, *a corporation of England*, | : |
| **Filatura Pettinata V.V.G**. **Di Stefano Vaccari & C.** | : |
| **(S.A.S. )**, *a company of Italy*, | : |
| **Sion Elalouf** and **Diane Elalouf**, *of New York*, | : |
| **Jeffrey J. Denecke, Jr.**, *of New York*, | : |
| **Jay Opperman**, *of New Jersey*, | : |
| **Debbie Bliss**, *of England*, | : |
| *Defendants*. | : |
| | : |

**Civil Action**

**No. 02: 08 - CV - 04221**

**Lead Case**

# EXHIBIT " 1 "



**Pepper Hamilton LLP**
*Attorneys at Law*

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

Joanna J. Cline
direct dial: (215) 981-4520
clinej@pepperlaw.com

November 21, 2012

***Via U.S. Mail &Email***

James F. Casale, Esquire
8226 Germantown Avenue
Chestnut Hill, PA 19118

> Re:  The Knit With v. Knitting Fever, Inc. et al. and
>       The Knit With v. Eisaku Noro & Co., Ltd., et al.
>       <u>Civil Action Nos. 2008-cv-4221 and 2008-cv-4775 (consolidated)</u>

Dear Mr. Casale:

Enclosed please find a CD containing documents bearing Bates-numbers CASKDL000527-CASKDL000604. We expect you already received copies of these documents from Mr. Langley or Mr. Guite and/or reviewed them by accessing the public docket for the United States District Court for the Western District of Washington (Case No. 10-861, dkt. no. 739), but provide them to you in the abundance of caution.

Sincerely,

Joanna J. Cline

Enclosure (via U.S. Mail only)

## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **The Knit With**, *a Pennsylvania Partnership*, | : | |
| *Plaintiff*, | : | |
| *vs.* | : | **Civil Action** |
| **Knitting Fever, Inc**., *a New York corporation*, | : | |
| **Designer Yarns, Ltd.**, *a corporation of England*, | : | |
| **Filatura Pettinata V.V.G**. **Di Stefano Vaccari & C.** | : | **No. 02: 08 - CV - 04221** |
| **(S.A.S. )**, *a company of Italy*, | : | |
| **Sion Elalouf** and **Diane Elalouf**, *of New York*, | : | |
| **Jeffrey J. Denecke, Jr.**, *of New York*, | : | **Lead Case** |
| **Jay Opperman**, *of New Jersey*, | : | |
| **Debbie Bliss**, *of England*, | : | |
| *Defendants*. | : | |
| | : | |

# Exhibit " 2 "

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Massachusetts

| | |
|---|---|
| Cascade Yarns, Inc. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   10-0861 |
| Knitting Fever, Inc., et al. | ) |
| | ) (If the action is pending in another district, state where: |
| *Defendant* | ) Western District of Washington         ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  CCMI
6 Beacon Street, Suite 1125; Boston, Massachusetts 02108-3812

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

See document requests attached as Exhibit A.

| Place: Pepper Hamilton LLP | Date and Time: |
|---|---|
| Oliver Street Tower, 15th Floor, 125 High Street Boston, MA 02110 | 04/18/2012 10:00 am |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date: March 30, 2012

| *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*     Knitting Fever, Inc.,
Designer Yarns, Ltd, Sion Elalouf, Debbie Bliss, Jay Opperman, KFI, Inc , who issues or requests this subpoena, are:

Joshua R. Slavitt (slavittj@pepperlaw.com)
Pepper Hamilton LLP, 3000 Two Logan Square
Philadelphia, PA 19103 (215) 981-4000

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  10-0861

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____     on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____     for travel and $ _____     for services, for a total of $  ____0.00____  .

I declare under penalty of perjury that this information is true.

Date: _____                     _____
                                            *Server's signature*

                                         _____
                                            *Printed name and title*

                                         _____
                                            *Server's address*

Additional information regarding attempted service, etc:

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## EXHIBIT A

### DEFINITIONS AND INSTRUCTIONS

A.      The term "CCMI" when used herein shall mean the Cashmere and Camel Hair

Manufacturers Institute including its officers, directors, members, partners, employees, agents,

and representatives thereof, and any other persons or entities acting on its behalf or under its

control.

B.      The term "document" when used herein shall mean all materials encompassed by Rule 34

of the Federal Rules of Civil Procedure, including, without limiting the generality of the

foregoing, printout sheets, video recordings, tape recordings, photographs, microfilm, notes,

letters, memoranda, reports, ledgers, worksheets, books, magazines, notebooks, diaries,

calendars, appointment books, registers, charts, tables, papers, agreements, contracts, purchase

orders, acknowledgments, invoices, authorizations, budgets, analysis, projections, transcripts,

minutes of meetings of any kind, correspondence, telegrams, computer and/or data processing

discs, e-mail, electronic or computer data, instructions, announcements, schedules, price lists,

mechanical or electric sound recordings and any transcripts thereof, telephone messages, notes of

conversations, jottings on desk calendars, canceled checks, appraisals, site plans, financial

statements, proposals, telephone message logs, notes, vouchers, books of accounts, each and

every other means by which information is recorded or stored, and all originals and non-identical

copies of each. The above definition is intended to be inclusive and comprehensive.

C.      In addition to the documents defined in A above, an electronic version of the materials

requested includes any materials stored on computer or computer-accessible medium (such as

hard drives, flash drives, CD-ROM storage, file server storage, back-up tapes, and or computer

folders).

D.      If you withhold any document based upon a claim of privilege, please identify the

document withheld by (a) its date; (b) its author; (c) the type of document (i.e., letter,

memorandum, receipt or invoice); (d) its present custodian, or each custodian if there is more

than one copy thereof; and (e) a general description of its subject matter.

E.      It is possible that more than one request will call for the same document. The presence of

such duplication is not to be interpreted to narrow or limit the normal interpretation placed on

each individual request.

## DOCUMENT REQUESTS

The documents to be produced by you pursuant to this subpoena are the following:

1.      Documents sufficient to showing the results of round trials conducted by
CCMI in which Kenneth Langley or K.D. Langley fiber Testing Services participated.

2.      Documents sufficient to identify the round trial results for Kenneth
Langley or K.D. Langley Fiber Testing Services including but not limited to whether CCMI
assigned a "pass" or "fail" grade based on correct fiber identification within three percentage
points.

3.      Documents sufficient to identify the participants in each of the round trials
conducted by CCMI in which Kenneth Langley or K.D. Langley Fiber Testing Services
participated.

# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **The Knit With**, *a Pennsylvania Partnership*, | : |
| *Plaintiff*, | : |
| *vs.* | : |
| **Knitting Fever, Inc**., *a New York corporation*, | : |
| **Designer Yarns, Ltd.**, *a corporation of England*, | : |
| **Filatura Pettinata V.V.G**. **Di Stefano Vaccari & C.** | : |
| **(S.A.S. )**, *a company of Italy*, | : |
| **Sion Elalouf** and **Diane Elalouf**, *of New York*, | : |
| **Jeffrey J. Denecke, Jr.**, *of New York*, | : |
| **Jay Opperman**, *of New Jersey*, | : |
| **Debbie Bliss**, *of England*, | : |
| *Defendants*. | : |
| | : |

**Civil Action**

**No. 02: 08 - CV - 04221**

**Lead Case**

# Exhibit " 3 "

| | |
|---|---|
| **From:** | Jane Lomas |
| **To:** | Rob Dunbabin |
| **Sent:** | 9/28/2010 4:13:53 PM |
| **Subject:** | Re: KFI uses CCMI's report to say that cashmere testing is inherently unreliable. |

I don't know to what study he is referring but I suspect this is a misreading.

Karl Spilhaus
President
Cashmere and Camel Hair Manufacturers Institute
6 Beacon Street, Suite 1125
Boston MA 02108 (USA)
+1 617 542 7481
kspilhaus@cashmere.org
----- Original Message -----
**From:** Rob Dunbabin
**To:** 'James Casale' ; info@cashmere.org
**Sent:** Tuesday, September 28, 2010 4:22 PM
**Subject:** KFI uses CCMI's report to say that cashmere testing is inherently unreliable.

Karl,

KFI just posted this on a public forum www.ravelry.com. I suspect that they have also caused a copy to be mailed to all or most of their customers. I am not personally familiar with the CCMI document to which Mr. Denecke of Knitting Fever is referring to. However, if it KFI's position that Cashmere testing is routinely off by 5-10%?

> ℓ
> posted 8 minutes ago
> 532

Dear Friends and Customers,

It is extremely unfortunate that Cascade insists on litigating its dispute with Knitting Fever in the publi rather than in Court. But in light of Cascade's recent open letter, KFI felt it was important to provide y more complete picture of the situation.



Cascade's lawsuit against KFI challenges the accuracy of the labels of three Debbie Bliss yarns from 2 fourteen yarns recently sold by KFI (five Debbie Bliss yarns, and nine yarns from four other brands). I Cascade had tests performed on these yarns, and these tests reported that the fiber content of these ya at variance with their stated fiber content.

KFI ▾
125 posts

Before we grab our torches and pitchforks, what are the facts?

On the basis of just these test reports, **and nothing more**, Cascade has concluded that KFI must be co with its supplier of Debbie Bliss yarns, the manufacturer of Debbie Bliss yarns, several individuals asse with KFI or its Debbie Bliss supplier, and even Debbie Bliss herself, to make and sell Debbie Bliss yar mislabeled as to their cashmere content. This is simply not true.

First and foremost, it has always been KFI's intention to only sell yarns of the highest quality that are l accurately and otherwise in compliance with all applicable regulations. Because of this commitment to KFI stands behind all of the products it sells. We have provided, and we will continue to provide, cont guaranties to any KFI customer in good standing upon request. Furthermore, KFI continues to take the necessary steps to insure that only the finest products from only the most reliable suppliers are brough market for its valued customers.

CAS 001063

What's more, despite KFI's open offer to provide continuing guaranties to any KFI customer in good st who requests one, Cascade has needlessly sought the immediate intervention of the Court by moving f preliminary injunction. Contrary to Cascade's assertion, KFI has opposed this motion (in part, because Cascade's **"unclean hands"**) and, in fact, motions to dismiss the entire action are now pending.

Cascade would have you believe that it has been routinely testing its own yarns. **But if that's the case hasn't Cascade bothered to inform you of the "non-compliant" results of these tests?**

Recently, KFI had a number of Cascade's yarns analyzed. These tests reported that the fiber content o **eighteen** different Cascade yarns were at variance with their stated fiber content. In some cases these variances were small, while in others they were quite substantial. Some of Cascade's yarns also comple mis-identified one fiber for another (polyester/nylon instead of acrylic; acrylic instead of viscose; bam instead of viscose), and six of Cascade's yarns that we have found (only two of which were tested for content) fail to provide country of origin information as required by law.

So, do KFI's test reports prove that Cascade is at the center of a vast, international conspiracy? Of cou And neither do Cascade's test reports - on even fewer of KFI's yarns - prove the same about KFI.

We have learned that fiber analysis is not a simple matter, particularly when testing blends of natural s fibers. As is widely-recognized in the industry, accurate fiber identification requires extensive training even with such training, judgments distinguishing wool from cashmere remain highly subjective.

In 2007, CCMI (Cashmere and Camel Hair Manufacturer's Institute) conducted a study in which 15 ou member labs - **more than 50%** - reported the fiber content of known samples of wool/cashmere blend *the accepted 3% tolerance*. **Some labs were off by more than 10%!** What's more, even if a lab techn were to consistently maintain an accuracy rate of 90%, the content of a wool/cashmere blend that actu contains 12% cashmere could be **reported** as 5-6% cashmere. Such subjectivity and inaccuracy may h explain the inconsistent results Cascade received for multiple tests on our yarns.

Cascade and KFI are competitors and, unfortunately, Cascade has chosen to compete by taking advan our open judicial system with a handful of inconsistent test reports and baseless accusations of intentic misconduct. Having done so, KFI will continue to defend itself, and we are confident that we will prev

KFI is thankful for your continued support.

CAS 001064

# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **The Knit With**, *a Pennsylvania Partnership*, | : |
| *Plaintiff*, | : |
| *vs.* | : |
| **Knitting Fever, Inc**., *a New York corporation*, | : |
| **Designer Yarns, Ltd.**, *a corporation of England*, | : |
| **Filatura Pettinata V.V.G**. **Di Stefano Vaccari & C.** | : |
| **(S.A.S. )**, *a company of Italy*, | : |
| **Sion Elalouf** and **Diane Elalouf**, *of New York*, | : |
| **Jeffrey J. Denecke, Jr.**, *of New York*, | : |
| **Jay Opperman**, *of New Jersey*, | : |
| **Debbie Bliss**, *of England*, | : |
| *Defendants*. | : |
| | : |

**Civil Action**

**No. 02: 08 - CV - 04221**

**Lead Case**

# EXHIBIT " 4 "

## Kenneth Langley

| | |
|---|---|
| **From:** | "Jane Lomas" <jlomas@cashmere.org> |
| **To:** | "Kenneth Langley" <kdlangley@earthlink.net> |
| **Sent:** | Wednesday, May 24, 2006 12:28 PM |
| **Attach:** | Fall RT Results Report Samples 4-6.xls; Fall RT Results Report Samples 1-3.xls; Participants list.doc |
| **Subject:** | CCMI FALL ROUND TRIAL REPORT OF RESULTS |

# CCMI FALL ROUND TRIAL REPORT OF RESULTS

**To:**   **K.D. Langley Fiber Services**
   - Dr. Ken Langley

Last fall you were invited to participate in the CCMI Fall 2005 Round Trial.
The samples were labeled by number 1-6 in separate polyethylene bags. 44 laboratories were invited to participate and 27 laboratories did.  A list of those labs that participated is attached.

The final report of results is attached.  Under each sample heading is the actual sample identification. (i.e.: Sample 1 – fibers  -- 80% cashmere / 20% wool).

Your lab # on this report is **3**

We thank you for your participation is this round trial.  Your cooperation and participation will assist CCMI and the analytical communities to better understand the current issues of testing, analysis and fiber identification, emphasizing the importance of accuracy and reproducibility of analytical results among laboratories.

# CCMI

Cashmere and Camel Hair Manufacturers Institute
6 Beacon Street, Ste. 1125, Boston, MA 02108

5/24/06

CONFIDENTIAL

# CCMI Round Trial - Fall 2005

## PARTICIPANTS

**Bureau Veritas CPS (Hong Kong)**
– Wong Hui Sun

**Bureau Veritas CPS (Shanghai)**
–William Wu

**Bureau Veritas CPS (US)**
- Srini Venkataraman

**China National Quality Supervision & Inspection**
- Ms. Chen Jihong, Director

**CMA Testing & Certification Labs**
- Mr. Wilson Wong, Manager

**CNR- ISMAC Biella/Genoa**
-Dr. Claudio Tonin

**DWI-Deutsches Wollforschungsinstitut**
-Pro Franz J. Wortmann

**Faserinstitut Bremen E. V.**
- Ms. Tanja Slootmaker

**Inner Mongolia Erdos Cashmere Group**
- Ms. Cathy Meng/ Yang Guifen, Director

**Intertek Consumer Goods North America – (US)**
– Yahaira A. Kolbeck

**Intertek Testing Services (Guangzhou)**
- Hiddi Sun

**Intertek Testing Services (Hong Kong)**
-  Ms. Brenda Cheung

**Intertek Testing Services (India)**
– Mr. Amrut Desai

**Intertek Testing Services (Shanghai)**
– Linda Shi

**Intertek Testing Services (Singapore)**
– Gan Sun Chong

**Intertek Testing Services – (Tianjin)**
-  Daniel Han

**Japan Spinners Inspecting Foundation**
- Mr. Atsunobu Nakamura

**K. D. Langley Fiber Services**
-Prof. Kenneth Langley

**Laboratorio di Analisi Prove e Ricerche Tessili**
- Mr. Primo Brachi

**Magazzini Generali di Prato**
- Dr. Giuseppe Bartolini

**Nuovo Istituto Certificazione Qualta S.R.L.**
– Mr. Buraschi Luciano

**SGS Hong Kong, Ltd.**
- Ruth Hon

**Shirley Technologies Ltd. (BTTG Ltd.)**
– Julia Bullers

**South Trading Limited**
- Mr. Henry Lu

**Specialized Technology Research Ltd. (HK)**
- Mr. Billy Lau/ Ms. Ling Li

**STR -Specialized Technology Resources(US)**
- Nick Agrawal / Ron Pacheco

**TFT (Ilikey) Ltd.**
– Mary Lunn

*  44 Laboratories invited to participate – 27 Laboratories participated.

## CCMI Fall Round Trial
## 2005

| Lab # | Meth. Used | Sample 1 - fibers 80% cashmere / 20% wool | Sample 2 - fibers 50%cashmere / 50%wool | Sample - 3 fibers 100% cashmere |
|---|---|---|---|---|
| 1 | DNA | 80.4% cashmere / 19.6% wool | 54.9% cashmere / 45.1% wool | 100% cashmere |
| 2 | BIO | 76.2% cashmere / 23.8% wool | 48.3% cashmere / 51.7% wool | 40.8% cashmere / 59.2% wool |
| 3 | LM | 84% cashmere   16% wool | 68% wool / 32%cashmere. | 100%cashmere. |
| 4 | LM | 66.8% cashmere / 33.2% wool | 47.2% cashmere / 52.8% wool | 95.0% cashmere /  5.0% wool |
| 6 | LM | 87.5% cashmere /  12.5% wool | 47.2% cashmere / 52.8%wool | 100% cashmere |
| 7 | LM | 88.9% cashmere /   11.1% wool | 53% wool /   47% cashmere | 100% cashmere |
| 8 | SEM | 83.4% cashmere /  16.6% wool | 59.5% cashmere / 40.5% wool | 100% cashmere |
| 9 | LM | 78.3% cashmere / 21.7% wool | 64.2% wool / 35.8% cashmere | 100% cashmere |
| 10 | LM | 78% cashmere / 22% wool | 100% wool | 92.96% cashmere /  7.04% wool |
| 11 | LM | 76.1% cashmere / 23.9% wool | 54.3% wool / 45.7% cashmere | 100% cashmere |
| 12 | LM | 79.5% cashmere /  20.5% wool | 49.4% cashmere /  50.6% wool | 100% cashmere |
| 13 | LM | 79.86% cashmere /20.14% wool | 50.15% wool / 49.85% cashmere | 100% cashmere |
| 14 | LM | 81% cashmere / 19% wool | 53% cashmere / 47% wool | 100% cashmere |
| 15 | LM | 79.6% cashmere / 20.4% wool | 51.13% cashmere / 48.87% wool | 100% cashmere |
| 16 | LM | 77% cashmere / 23% wool | 51% cashmere / 49% wool | 100% cashmere |
| 17 | LM | 90% cashmere /   10% wool | 77.9% cashmere / 22.1% wool | 49.2% cashmere /  50.8% wool |
| 18 | LM | 92.2% cashmere /   7.8% wool | 63.5% cashmere /  36.5% wool | 100% cashmere |
| 19 | LM | 80% cashmere /  20% wool | 50.4% cashmere / 49.6% wool | 98.3% cashmere /  1.7% wool |
| 20 | LM | 77.3% cashmere / 22.7% wool | 52.7% wool / 47.3% cashmere | 100% cashmere |
| 21 | LM | 79.3% cashmere / 20.7% wool | 54.2% wool / 45.8% cashmere | 100% cashmere |
| 22 | LM | 92 % wool /   8% cashmere | 100% cashmere | 100% cashmere |
| 23 | LM | 72.6% cashmere /  27.4% wool | 77.7% wool / 22.3% cashmere | 100% cashmere |
| 24 | LM | 86.7% cashmere /  13.3% wool | 79.3% wool /  20.7% cashmere | 94.9% cashmere /   5.1% wool |
| 25 | LM | 75% cashmere / 25% wool | 52% cashmere / 48% wool | 100% cashmere |
| 26 | LM | 92% cashmere / 8% wool | 75% cashmere / 25% wool | 100% cashmere |
| 27 | SEM | 90.5% cashmere / 9.5% wool | 40.7% cashmere / 63.4% wool | 100% cashmere |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

CAS KDL 00553

# CCMI Fall Round Trial
## 2005

| Lab # | Meth. Used | Sample 4 - fibers | Sample 5 - fibers | Sample - 6 yarns |
|---|---|---|---|---|
| | | 100% yak | 100% yak | 90% wool / 10% cashmere |
| 1 | DNA (#6 LM) | 82.4% yak / 16.8% wool | 100% yak | 88.5% wool / 11.5% cashmere |
| 2 | BIO | 100% yak | 100% yak | 80.8% wool / 19.2% cashmere |
| 3 | LM | 60% yak / 35%wool        3% camel / 2% cashmere | 100% yak | 100% wool |
| 4 | | 6.6% wool / 93.4% yak | 100% yak | 6.8% cashmere / 93.2%wool |
| 6 | LM | 100% yak | 100% yak | 11% cashmere / 89% wool |
| 7 | LM | 100% yak | 100% yak | 90.5% wool / 9.5% cashmere |
| 8 | SEM | 86.9% yak / 13.1% wool | 100% yak | 6.2% cashmere / 93.8% wool |
| 9 | LM | 100% yak | 100% yak | 93.1% wool / 6.9% cashmere |
| 10 | LM | 100% wool | 100% yak | 100% wool |
| 11 | LM | 82.8% yak / 17.2% wool | 100% yak | 89.9% wool / 10.1% cashmere |
| 12 | LM | 97.4% yak / 2.6% wool | 100% yak | 92% wool / 8% cashmere |
| 13 | LM | 100% yak | 100% yak | 89.99% wool 10.01% cashmere |
| 14 | LM | 90% yak / 10% wool | 100% yak | 83% wool / 17% cashmere |
| 15 | LM | 100% yak | 100% yak | 92.31% wool / 7.69% cashmere |
| 16 | LM | 65% wool / 35% yak | 96% yak / 4% cashmere | 81% wool / 19% cashmere |
| 17 | LM | 100% cashmere | 19.8% cashmere        80.2% wool | 72.5% cashmere / 27.5% wool |
| 18 | LM | 100% cashmere | 100% yak | 88.9% wool / 11.1% cashmere |
| 19 | LM | 68.1% yak / 29.2% camel / 2.7% wool | 100% yak | 90.5% wool / 9.5% cashmere |
| 20 | LM | 92.1% yak / 7.9% wool | 100% yak | 89.6% wool / 10.4% cashmere |
| 21 | LM | 90.5% yak / 9.5% wool | 100% yak | 88.9% wool / 11.1% cashmere |
| 22 | LM | 45.4% cashmere / 36.8%wool / 17.8%camel | 96 % camel / 4% cashmere | 48.5% cashmere / 51.5% wool |
| 23 | LM | 89.1% cashmere / 10.9% wool | 100% cashmere | 100% wool |
| 24 | LM | 50% wool / 50% yak | 100% Yak | 100% wool |
| 25 | LM | 87% Yak / 13% wool | 100% Yak | 89% wool / 11% cashmere |
| 26 | LM | 53% cashmere / 37% yak / 10% mohair | 100% yak | 100% wool |
| 27 | SEM | 31% cashmere / 28% wool / 36% yak / 1% camel / 4% not identified | 100% yak | 38% cashmere / 62% wool |
| | | | | |
| | | | | |
| | | | | |

CAS KDL 00554

## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **The Knit With**, *a Pennsylvania Partnership*,<br>*Plaintiff*,<br>*vs.*<br>**Knitting Fever, Inc**., *a New York corporation*,<br>**Designer Yarns, Ltd.**, *a corporation of England*,<br>**Filatura Pettinata V.V.G**. **Di Stefano Vaccari & C.**<br>**(S.A.S. )**, *a company of Italy*,<br>**Sion Elalouf** and **Diane Elalouf**, *of New York*,<br>**Jeffrey J. Denecke, Jr.**, *of New York*,<br>**Jay Opperman**, *of New Jersey*,<br>**Debbie Bliss**, *of England*,<br>*Defendants*. | **Civil Action**<br><br>**No. 02: 08 - CV - 04221**<br><br>**Lead Case** |

# EXHIBIT " 5 "

**N168517**
June 9, 2011
CLA2-OT:RR:NC:N3:351
CATEGORY: Classification
Mr. Karl Spilhaus President Cahmere and Camel Hair Manufacturer's Institute 6 Beacon Street, Suite 1125 Boston, MA 02108
RE:    Classification and country of origin determination for a cashmere and wool sample test kit; 19 CFR 102.21(c)(3)
Dear Mr. Spilhaus:

This is in reply to your letter dated May 18, 2011, requesting a classification and country of origin determination for a cashmere and wool sample test kit which will be imported into the United States.
FACTS:

The subject merchandise consists of 48 samples of various strains of cashmere, camel, wool, yak, and other such fibers from various countries (China, Afghanistan, Australia, and others). Each two-ounce fiber sample is contained in a small vial. The vials are packaged in a sturdy box, measuring 14" across x 10-1/2" deep x 3" high, containing cardboard separators forming an 8 x 6 grid. The box is made of textile fabric over cardboard; it has a flip-up cover with a snap closure and is imprinted with the institutes name and "Fiber Box / 2011 / 1st edition."
The plastic cap of each vial is labeled to indicate its place within the grid, from A-1 to H-6. The identification numbers correspond to a chart that is included in the box and identifies each sample: A-1 / Cashmere Chinese Alashan Type White; E-3 / Goat Fiber Mongolian Brown; G-4 / Wool Australian Treated Merino, and so on. Each vial is labeled the same, although we note there are some mismatches in the kit we received. The chart is laminated between two sheets of clear plastic and measures approximately 12" x 8-1/2". The back of the chart is printed with information about the samples and the descriptive terms used to label the samples.

The kit is designed to be used by textile testing laboratories and similar organizations "to promote improved techniques for identifying cashmere and other luxury animal hair." You state that the samples will be used by a technician as standards in fiber identification; the kit contains both typical and atypical fibers of certain species. Using a microscope and other tools, the technician can compare other fibers to the standard fibers in the kit.
The manufacturing operations for the cashmere and wool sample test kit are as follows: the samples are collected from various fiber-producing countries. Some fibers have been modified chemically or physically, or both, and bleached or otherwise artificially treated. All have been examined by multiple laboratories by light and scanning electron microscopes, or both. In some cases, DNA was also analyzed. You do not state where any of these operations took place.

The samples are sent to CCMI's facility in Japan where they are assembled into the kit. Approximately 100 kits have been produced and will be imported by CCMI and stored at your Boston offices until they are shipped individually to laboratories in the United States and abroad. They are not for sale through what might be considered normal channels of trade.
ISSUE:

What are the classification and country of origin of the subject merchandise?
CLASSIFICATION:

Note 7 in Subchapter XVII of Chapter 98, HTSUS, defines prototypes for the purposes of subheading 9817.85.01 and sets forth certain conditions and limitations governing classification in the

subheading. Subheading 9817.85.01 provides for duty-free treatment for "[p]rototypes to be used exclusively for development, testing, product evaluation, or quality control purposes." Based upon the facts which you have provided, as stated above, we find that the cashmere and wool sample test kit meets the definition of prototypes in Section XXII, Subchapter XVII, U.S. Note 7, HTSUS.

Pursuant to U.S. Note 7 to Subchapter XVII, the applicable heading for the sample test kit will be 9817.85.01, HTSUS, which provides for "Prototypes to be used exclusively for development, testing, product evaluation, or quality control purposes." The rate of duty will be Free.

Duty rates are provided for your convenience and are subject to change. The text of the most recent HTSUS and the accompanying duty rates are provided on World Wide Web at http://www.usitc.gov/tata/hts/.


COUNTRY OF ORIGIN - LAW AND ANALYSIS:

Section 334 of the Uruguay Round Agreements Act (codified at 19 U.S.C. 3592), enacted on December 8, 1994, provided rules of origin for textiles and apparel entered, or withdrawn from warehouse for consumption, on and after July 1, 1996. Section 102.21, Customs Regulations (19 C.F.R. 102.21), published September 5, 1995 in the Federal Register, implements Section 334 (60 FR 46188). Section 334 of the URAA was amended by section 405 of the Trade and Development Act of 2000, enacted on May 18, 2000, and accordingly, section 102.21 was amended (68 Fed. Reg. 8711). Thus, the country of origin of a textile or apparel product shall be determined by the sequential application of the general rules set forth in paragraphs (c)(1) through (5) of Section 102.21.

Paragraph (c)(1) states, "The country of origin of a textile or apparel product is the single country, territory, or insular possession in which the good was wholly obtained or produced." As the subject merchandise is not wholly obtained or produced in a single country, territory or insular possession, paragraph (c)(1) of Section 102.21 is inapplicable.

Paragraph (c)(2) states, "Where the country of origin of a textile or apparel product cannot be determined under paragraph (c)(1) of this section, the country of origin of the good is the single country, territory, or insular possession in which each of the foreign materials incorporated in that good underwent an applicable change in tariff classification, and/or met any other requirement, specified for the good in paragraph (e) of this section:" Paragraph (e) in pertinent part states, The following rules shall apply for purposes of determining the country of origin of a textile or apparel product under paragraph (c)(2) of this section:

| HTSUS | Tariff shift and/or other requirements |
|---|---|
| 5101-5103 | A change to heading 5101-5103 from any other chapter. |

As the wool and animal hairs are all classified in Chapter 51, they do not meet the terms of the above tariff shift and Section 102.21(c)(2) is inapplicable.

Section 102.21(c)(3) states,
Where the country of origin of a textile or apparel product cannot be determined under paragraph (c) (1) or (2) of this section:

(i) If the good was knit to shape, the country of origin of the good is the single country, territory, or insular possession in which the good was knit; or

(ii) Except for goods of heading 5609, 5807, 5811, 6213, 6214, 6301 through 6306, and 6308, and subheadings 6209.20.5040, 6307.10, 6307.90, and 9404.90, if the good was not knit to shape and the good was wholly assembled in a single country, territory, or insular possession, the country of origin of the good is the country, territory, or insular possession in which the good was wholly assembled.

Subsection (i) is not relevant to this merchandise. The sample test kit is assembled in a single country, Japan, so according to the terms of subsection (ii), Section 102.21(c)(3) applies.

HOLDING:

The cashmere and wool sample test kit is classified in subheading 9817.85.01, HTSUS, as a prototype to be used exclusively for development, testing, product evaluation, or quality control purposes. The country of origin of the sample test kit is Japan.

The holding set forth above applies only to the specific factual situation and merchandise identified in the ruling request. This position is clearly set forth in section 19 CFR 177.9(b)(1). This section states that a ruling letter, either directly, by reference, or by implication, is accurate and complete in every material respect.

This ruling is being issued under the provisions of Part 177 of the Customs Regulations (19 C.F.R. 177). Should it be subsequently determined that the information furnished is not complete and does not comply with 19 CFR 177.9(b)(1), the ruling will be subject to modification or revocation. In the event there is a change in the facts previously furnished, this may affect the determination of country of origin. Accordingly, if there is any change in the facts submitted to Customs, it is recommended that a new ruling request be submitted in accordance with 19 CFR 177.2.

Your sample is being returned.

A copy of the ruling or the control number indicated above should be provided with the entry documents filed at the time this merchandise is imported. If you have any questions regarding the ruling, contact National Import Specialist Mitchel Bayer at (646) 733-3102.

Sincerely,
Robert B. Swierupski Director National Commodity Specialist Division